UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                                              :
DARYL K. WASHINGTON and SUNDAY    :   Civil Action No. 05-cv-10034
PLAYERS, INC.,                                :
                                              :   CORRECTED SECOND AMENDED
                    Plaintiffs,               :   COMPLAINT
                                              :
                                              :
        vs.                                   :
                                              :
KELLWOOD COMPANY,                             :
                                              :
                    Defendant.                :
                                              :
———————————————————— x

Plaintiffs Daryl K. Washington and Sunday Players, Inc. (collectively, "Plaintiffs"), by and through the undersigned counsel, allege the following as and for their Corrected Second Amended Complaint:

## PARTIES

1.      Plaintiff Daryl K. Washington ("Washington") is an individual residing in Dallas County, Texas with his address at 323 N. St. Paul, Suite 1875, Dallas, Texas 75201.

2.      Plaintiff Sunday Players, Inc. is, and was at all relevant times, a corporation organized and existing under the laws of the State of Texas with its principal place of business at 323 N. St. Paul, Suite 1875, Dallas, Texas 75201.

3.      Upon information and belief, defendant Kellwood Company, Inc. ("Kellwood" or "Defendant") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 600 Kellwood Parkway, Chesterfield, Missouri 63017.  Kellwood also does business in the State of New York, with one such business located in this District, at 120 W. 45th Street, New York, New York 10036.

## JURISDICTION AND VENUE

4.      Personal jurisdiction is proper in this Court pursuant to the express terms of one of the agreements upon which Plaintiffs are suing.  This Court has subject matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

5.      Venue is proper in this District because Kellwood expressly consented to jurisdiction by this Court.  *See*, Exhibit A at ¶13.1.  Venue is also proper pursuant to 28 U.S.C. §1391 because Kellwood is subject to personal jurisdiction in the State of New York, and because a substantial portion of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

6.     In or about 2002, Washington developed, and Plaintiffs owned, full right, title and interest in several licensed marks (collectively, the "Licensed Marks") and was beginning to engage in the business of designing and seeking to sell apparel and accessories using the Licensed Marks.

7.     The market for the type of apparel that Plaintiffs were beginning to sell was estimated at several hundred million dollars annually and growing.  Because of the sizeable nature of this market, Plaintiffs began to explore partnering with major manufacturing and marketing companies in order to exploit the market for the type of apparel developed by Plaintiffs.  Kellwood initiated contact with Plaintiffs to discuss a possible partnership that would allow both to develop this market under the Sunday Players brand.

8.     In or about June 2002, two Kellwood authorized agents and/or representatives, Greg Dorf ("Dorf") and Rick Peterson ("Peterson") traveled to Dallas, Texas for the purpose of discussing with Plaintiffs the possibility that Kellwood would serve as the manufacturer of products displaying Plaintiffs' marks.

9.     During this meeting, Kellwood's authorized agents and/or representatives represented to Plaintiffs that Kellwood believed the Sunday Players brand would be very successful, profitability-wise, and the conversation turned to Kellwood discussing a potential joint venture with Plaintiffs.

10.     Kellwood also represented to Plaintiffs that Kellwood had significant experience in marketing and selling apparel and that it had substantial and unlimited relationships with "major retailers," which would enable Plaintiffs' products to achieve hundreds of millions annually in sales.

11.     In or about July 2003, Kellwood made a preliminary introduction of Plaintiffs to representatives of a few retailers, all of which expressed considerable interest in selling products

displaying Plaintiffs' marks.  Kellwood represented to Plaintiffs that this was proof that Kellwood

had inside contact and significant relationships with major retailers.

12.     After these brief introductions, however, Kellwood refused to allow Plaintiffs to meet

with these retailers again to discuss the Sunday Players products in more detail.

13.     On or about September 5, 2003, Kellwood told Plaintiffs that MTV, a well-known

cable television station, wanted to partner with Sunday Players, that MTV would promote the

Sunday Players brand, and that this promotion would lead to hundreds of millions in product sales.

14.     Also, on or about September 5, 2003, in an effort to persuade Plaintiffs to enter into a

license agreement, Kellwood represented that the initial orders with Target and Foot Locker would

easily exceed $10 million, with much larger sales to these and other retailers following the initial

orders.

15.     As a result of a series of Kellwood's representations, and in reliance thereon, on or

about November 25, 2003, Plaintiffs entered into a license agreement with Kellwood related to the

trademark Sunday Players (the "License Agreement"), a copy of which is attached hereto as Exhibit

A.

16.     The License Agreement contains the following provisions, *inter alia*:

(a)     **Section 1.1:** Licensor herby grants to Licensee....an exclusive license

throughout the territory in connection with the production, manufacture, advertising, promotion,

importation, distribution and sale of the [Licensed Products];

(b)     **Section 9.3:** Licensee shall provide Licensor an inventory of samples, not to

exceed a total cost of $25,000 wholesale per Royalty Year, to be used as giveaways (specifically to

give away to the individuals who endorse the Licensed Products), special events trade shows and to

be displayed in a showroom;

(c)     **Section 11.3:** Licensee has adopted a Code of Conduct setting forth standards of conduct.  Licensee agrees that it will…abide by the principles set forth therein (as amended from time to time) in conducting all aspects of its operations as such relate to the Licensed Products; and

(d)     **Section 12:** Licensor acknowledges that Licensee will be investing a substantial amount of capital in the infrastructure of this program and that Licensee will be given every reasonable opportunity to continue with the license as long as it is using its best efforts to comply with this Agreement and cure any breaches by Licensee that arise during the term hereof.

17.     Pursuant to Schedule A to the License Agreement, the expiration date is January 31, 2007, with an option to renew the License Agreement for an additional three years.

18.     The License Agreement also provides, in part, that Plaintiffs would be paid a royalty fee based on the sales of the Licensed Products.

19.     After an extensive search for sales groups to generate sales for the products, Plaintiffs retained four "Sales Groups" to help with sales of the products with the Sunday Players marks.

20.     On or about January 26, 2004, Kellwood stated in correspondence that it would announce, by press release, the agreement between Kellwood, Sunday Players and MTV.  Kellwood never issued this press release.

21.     Later, Kellwood once again flew to Dallas to meet with the Sales Groups that Plaintiffs had retained to assist with selling Plaintiffs' products.

22.     During these meetings, Kellwood indicated that it wanted to have direct control over everything related to sales; and stated that it wanted to take control over the Sales Groups previously maintained by Plaintiffs.

23.     Following several meetings with Plaintiffs and their Sales Groups, Kellwood, through Dorf and Peterson, made oral and written representations and agreements with Plaintiffs regarding Kellwood taking over the marketing and sales activities for Plaintiffs' products.

24.     On or about July 28, 2004, Peterson acknowledged that Kellwood entered into an agreement to take over the day to day operations of Sales, Marketing, Distribution and Customer Service for Sunday Players (the "Sales and Marketing Agreement").  Attached hereto as Exhibit B is a copy of an electronic acknowledgement of the Sales and Marketing Agreement.

25.     Specifically, in various oral and written agreements, Kellwood informed Plaintiffs that it would do the following, among other things:

(a)     Spend additional funds on marketing products using the Sunday Players name;

(b)     Finance the Sales Groups in their efforts to sell products using the Sunday Players name;

(c)     Supply additional products for endorsement deals; and

(d)     Allow Sunday Players' sales representatives to accompany Kellwood representatives on visits with retailers.

26.     In or about the first quarter of 2005, Kellwood terminated the agreements it had formed that related to the Sales Groups.

27.     In or about April, 2005, Kellwood indicated that it was terminating all agreements with Plaintiffs.

28.     Upon information and belief, during the time that agreements between Kellwood and Plaintiffs were in effect, Kellwood manufactured and marketed, and continues to manufacture and market, private label compression athletic apparel for the very same retailers that Kellwood represented to Plaintiffs would market Plaintiffs' products.

- 5 -

29.     Plaintiffs have, in good faith, fully and completely performed all of their obligations under the respective agreements at issue herein.

## CONDITIONS PRECEDENT

30.     All conditions precedent have been performed or have occurred as required.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Contract – License Agreement

31.     Plaintiffs reiterate and adopt each and every allegation of the aforementioned paragraphs as if set forth herein verbatim.

32.     As a consequence of the facts hereinabove alleged, Defendant materially breached the License Agreement in at least the following ways: (a) failing to use its best, or even reasonable, efforts to generate profits under the agreement; (b) failing to provide Plaintiffs' products with the required marketing, sales, and other expertise to increase the likelihood of success of the product; (c) refusing to provide Plaintiffs with $25,000 wholesale per Royalty Year, to be used as giveaways; (d) refusing to invest a substantial amount of capital in the infrastructure of this program; (e) terminating the License Agreement before the end of the expiration of the License Agreement; and (f) by failing to conduct all aspects of its operations with Plaintiffs in accordance with its principles and standards of conduct.

33.     Plaintiffs fully performed their obligations and have made demand upon Kellwood for the outstanding sums, to no avail.

34.     As a result of the foregoing breaches, Plaintiffs have been damaged in an amount not presently known but believed to be in excess of $50 million, plus incidental and consequential damages, plus interest.

- 6 -

## COUNT II

### Breach of Contract – Sales and Marketing Agreement

35.     Plaintiffs reiterate and adopt each and every allegation of the aforementioned paragraphs as if set forth herein verbatim.

36.     As a consequence of the facts hereinabove alleged, Defendant materially breached the Sales and Marketing Agreement in at least the following particulars: (a) refusing to spend sufficient funds on marketing products using the Sunday Players name; (b) failing to finance the sales group and other groups in their efforts to sell products using the Sunday Players name; (c) refusing to supply products for endorsement deals; and (d) refusing to allow representatives from Sunday Players to accompany Kellwood representatives on visits with retailers.

37.     As a result of the foregoing breaches, Plaintiffs have been damaged in an amount not presently known but believed to be in excess of $50 million, plus incidental and consequential damages, plus interest.

## COUNT III

### Fraud

38.     Plaintiffs reiterate and adopt each and every allegation of the aforementioned paragraphs as if set forth herein verbatim.

39.     During meetings with Kellwood, Plaintiffs made it known that it was important to Sunday Players that Kellwood had: (1) established contacts with retailers, (2) experience in the apparel industry, (3) and the resources to make the Plaintiffs' products successful.  Plaintiffs also made it known that they sought to establish a relationship with a manufacturer that did not manufacture, market or sell compression sportswear of the type that Plaintiffs sought to develop – a logical desire, given that Plaintiffs sought to establish their fledgling yet promising brand at a time when compression sportswear was just emerging as a highly profitable endeavor.  In response,

Kellwood represented that it did not manufacture, market or sell such merchandise, and otherwise led Plaintiffs to believe that it would not compete in the very same market that Plaintiffs sought to occupy.

40.    **Fraudulent Inducement.**  Specifically, and by example only, to induce Plaintiffs to enter into the initial contract, Kellwood represented that, based on its preexisting business relationships with certain sporting goods retailers, the initial orders of Plaintiffs' trademarked products would exceed $10 million and that subsequent orders would be much more.  In fact, Kellwood had no relationships that would lead to sales in that amount, or elected not to leverage those relationships to develop the Sunday Players brand.

41.    Kellwood also represented to Plaintiffs that it would use its "best efforts" to market Plaintiffs' products and, further, that it did not manufacture or sell the same types of merchandise that Plaintiffs sought to develop.  Despite these representations and unbeknownst to Plaintiffs, Kellwood was spending its time and efforts marketing its own line of compression sportswear for the same retailers to which Kellwood was supposed to market Plaintiffs' products.

42.    Moreover, Kellwood represented that it had a multimillion dollar deal with MTV that would be extremely profitable.  In actuality, Kellwood had no such deal.  When the License Agreement was negotiated, Kellwood never told Plaintiffs that the MTV agreement was entirely fabricated.  In fact, as demonstrated by Kellwood's own email, Kellwood represented to Plaintiffs that the MTV contract was a "done deal."  In a January 26, 2004 email Dorf refers to the MTV agreement as "our agreement with MTV" and "the agreement between Kellwood, Sunday Players and MTV."  However, upon information and belief, this agreement never existed.

43.    As a result of these and other misrepresentations of existing material facts, Plaintiffs executed an exclusive licensing contract with Kellwood and entered into a business relationship with

it, foregoing the opportunity to pursue a transaction with another company.  Moreover, at the time that Kellwood made its representations, Kellwood had no intention of performing as it had represented.  Rather, as explained herein, Kellwood sought to manufacture, market and sell its own competing line of compression sportswear.  Indeed, by inducing Plaintiffs to share their business plan, trademark and merchandise, Kellwood was able to advance its own competing line of merchandise under the guise of furthering the Sunday Players brand, all without Plaintiffs' knowledge.  Kellwood knew that if Plaintiffs were told there was no MTV agreement, and that Kellwood would visit retailers, without Plaintiffs in attendance, to market a competing product, Plaintiffs would not have entered into these agreements.

44.    Moreover, Kellwood's wrongful conduct includes, but is not limited to, Kellwood's abuse of its relationship of trust with Plaintiffs, which constitutes fraud.  On information and belief, Kellwood's authorized agents and/or representatives including, but not limited to Dorf and Peterson, knowingly and/or recklessly made omissions and/or representations of material facts to Plaintiffs which were untrue, and which omissions and/or misrepresentations were made and/or offered to deceive Plaintiffs and to induce Plaintiffs to take certain action(s) including, but not limited to, entering into certain contracts with Kellwood, placing trust in Kellwood, and, thereafter not terminating said agreements to seek immediate judicial relief.

45.    **Fraudulent Concealment.**  Kellwood "took over" Plaintiffs' entire sales and marketing operations months after the License Agreement was signed.  This established a partnership relationship rather than a simple commercial business transaction.  In fact, Kellwood represented to Plaintiffs that the relationship they had was a "partnership," as demonstrated by Dorf's January 26, 2004 email stating "we move into action and notify all retailers of this exciting

*partnership*." This clearly shows that Kellwood was representing to Plaintiffs that Kellwood believed there was a partnership between Kellwood and Plaintiffs.

46.    Kellwood's fraudulent concealments also include: (a) knowingly misrepresenting that it had secured a multimillion dollar deal with MTV, when it had not; (b) concealing from Plaintiffs that Kellwood planned to, and did, produce similar products for the same retailers to which Kellwood was supposed to market Plaintiffs' products; (c) concealing from Sunday Players that Kellwood representatives were making personal visits with retailers, and not inviting Plaintiffs to attend.

47.    Kellwood had a duty to disclose information to Plaintiffs as a result of: (a) Dorf and Peterson making a partial or ambiguous statements regarding the alleged multimillion dollar deal with MTV and Kellwood's visits to retailers; (b) Kellwood's relationship as Plaintiffs' business partner, which meant that Kellwood owed a fiduciary duty to Plaintiffs; and (c) Kellwood's superior knowledge of Kellwood's decision to market to retailers a product that competed with Plaintiffs' products.

48.    Moreover, at the time that Kellwood failed to disclose this information, Kellwood knew that Plaintiffs were unaware of this information. As alleged herein, Kellwood agreed to take over the marketing and sale of Plaintiff's products, and affirmatively represented that it would explore and establish marketing opportunities to benefit the Sunday Players brand. As a consequence of Kellwood's assumption of these obligations, and the representations that it made to Plaintiffs, Kellwood knew or should have known that Plaintiffs were unaware of the actual progress – or lack thereof – concerning each of the issues identified above.

49.    Specifically, Kellwood must have known that Plaintiffs were unaware of whether Kellwood had, in fact, lined up a multimillion dollar deal with MTV; that Kellwood planned to, and

did, produce similar products for the same retailers that it had represented were supposed to market Plaintiffs' products; and that Kellwood representatives had personal visits with retailers in Plaintiffs' absence.

50.     Upon information and belief, Defendants have profited greatly from the sales of Kellwood products that competed with Plaintiffs' products, which demonstrate both the motive and opportunity to commit fraud upon Plaintiffs.

51.     As shown in the License Agreement, Kellwood also did not notify Plaintiffs that it would market a competing line of compression sportswear.  In fact, Kellwood never informed Plaintiffs of this material fact.  Kellwood knew that if Plaintiffs were told there was no MTV agreement, and that Kellwood would visit retailers (without Plaintiffs in attendance) to market a competing product, Plaintiffs would not have entered into these agreements.  Moreover, Kellwood was aware that during the time of their relationship, Plaintiffs did not know of Kellwood's visits to the retailers to sell competing products.  Nor did Plaintiff know of the falsified MTV deal.

52.     These statements were fraudulent because Kellwood intended to gain an unfair advantage in the marketplace with Kellwood's own competing compression products.  Kellwood had the motive and the opportunity to commit the fraud because it secretly wanted to use Plaintiffs' trademarks to establish relationships with retailers and had the opportunity to defraud Plaintiffs when Kellwood took over all of Plaintiffs' sales and marketing operations and essentially jettisoned the Plaintiffs' operations.  Kellwood's actions in ignoring Plaintiffs' products and marketing its own products certainly constitute strong circumstantial evidence of conscious misbehavior.  This is exacerbated by the fact that Kellwood had the exclusive license on Plaintiffs' trademarks, which means that Plaintiffs were totally dependent on Kellwood for the marketing, manufacturing, selling and distribution of Plaintiffs' products.

53.    As a result of the foregoing conduct, Kellwood gained an advantage in the marketplace and Plaintiffs have been damaged in an amount not presently known but believed to be in excess of $50 million, plus incidental and consequential damages, plus interest.

### COUNT IV

### Promissory Estoppel

54.    Plaintiffs reiterate and adopt each and every allegation of the aforementioned paragraphs as if set forth herein verbatim.

55.    On or about July 28, 2004, Peterson acknowledged that Kellwood would take over the day to day operations of Sales, Marketing, Distribution and Customer Service for Sunday Players.

56.    Furthermore, Kellwood informed Plaintiffs that it would do the following, among other things:

(a)    Spend additional funds on marketing products using the Sunday Players name;

(b)    Finance the Sales Groups in their efforts to sell products using the Sunday Players name;

(c)    Supply additional products for endorsement deals; and

(d)    Allow Sunday Players' sales representatives to accompany Kellwood representatives on visits with retailers.

57.    Kellwood materially breached promises to Plaintiffs in at least the following particulars: (a) refusing to spend sufficient funds on marketing products using the Sunday Players name; (b) failing to finance the sales group and other groups in their efforts to sell products using the Sunday Players name; (c) refusing to supply products for endorsement deals; and (d) refusing to allow representatives from Sunday Players to accompany Kellwood representatives on visits with retailers.

58.     In the alternative, in the absence of a valid agreement, Kellwood made several promises to Plaintiffs that are clear and unambiguous on its terms.  These promises include: (a) a promise to spend additional funds on marketing and to finance the Sales Groups; (b) an agreement to supply products for endorsement deals; (c) a promise to allow representatives from Sunday Players to accompany Kellwood representatives on visits with retailers; (d) a promise to invest a substantial amount of capital in the infrastructure of this program; and (e) a promise to sign a multimillion dollar deal with MTV.

59.     Moreover, some of these promises were made after the parties' entry into the License and Sales Agreements.  In fact, Kellwood's representations concerning a deal with MTV occurred both before and after the parties' entry into the respective agreements.  For example, as noted above, in January 2004, after the parties had entered into the License Agreement (but before they had entered into the Sales Agreement), Kellwood made promises concerning its ability to secure a contract with MTV.  Plaintiffs relied upon these promises to their detriment, by foregoing the opportunity to pursue alternate arrangements concerning the development of the Sunday Players brand.

60.     Further, it was reasonable and foreseeable that Plaintiffs would, and Plaintiffs did, rely on these promises to their detriment and Plaintiffs sue Kellwood herein for the damages suffered as a result of Plaintiffs' reliance on Kellwood's promises.

61.     As a result of the foregoing conduct, Plaintiffs have been damaged in an amount not presently known but believed to be in excess of $50 million, plus incidental and consequential damages, plus interest.

## COUNT V

### Unjust Enrichment

62.    Plaintiffs reiterate and adopt each and every allegation of the aforementioned paragraphs as if set forth herein verbatim.

63.    As noted herein, Kellwood made clear and unambiguous promises to Plaintiffs, upon which Plaintiffs reasonably relied to their detriment.  These promises include: (a) a promise to spend additional funds on marketing and to finance the Sales Groups; (b) an agreement to supply products for endorsement deals; (c) a promise to allow representatives from Sunday Players to accompany Kellwood representatives on visits with retailers; (d) a promise to invest a substantial amount of capital in the infrastructure of this program; and (e) a promise to sign a multimillion dollar deal with MTV.

64.    Moreover, Kellwood utilized its position of superior knowledge and control to utilize the Licensed Marks for its benefit in developing its own line of competing compression athletic gear. Kellwood also did not inform Plaintiffs that it would market a competing line of such sportswear. Kellwood intended to, and did, gain an unfair advantage in the marketplace with its competing products.  In fact, it secretly wanted to use Plaintiffs' trademarks to establish relationships with retailers. The relationships that Defendant developed, while using Plaintiffs' products as an introduction, allowed Defendant to sell its own products at the expense of Plaintiffs.

65.    Defendant was enriched, at Plaintiffs' expense, by Defendant's actions and/or omissions as set forth in detail herein, under circumstances such that, in equity and good conscience, Defendant should repay Plaintiffs what Defendant has gained, and what Plaintiffs have suffered and/or lost, as a result of Defendant's said actions and/or omissions.

66.     As a result of the foregoing conduct, Plaintiffs have been damaged in an amount not presently known but believed to be in excess of $50 million, plus incidental and consequential damages, plus interest

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request judgment against Kellwood as follows:

A.     Actual and Compensatory Damages in an as yet to be determined amount;

B.     Damages sustained as a result of Kellwood's fraudulent conduct;

C.     Costs of Suit;

D.     Prejudgment and post-judgment interest; and

E.     Such other and further relief to which Plaintiffs may show themselves justly entitled.

## JURY DEMAND

Plaintiffs hereby request a trial by jury on all claims and issues so triable.

DATED: June 25, 2009

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
JOSEPH RUSSELLO

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

THE PITTMAN LAW FIRM, P.C.
AUBREY "NICK" PITTMAN
KRISTIN KAY SCHROEDER
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
Telephone:  214/459-3454
214/853-5912 (fax)

Attorneys for Plaintiffs

- 15 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2009, the foregoing Corrected Second Amended Complaint was filed with the Clerk of the Court for the United States District Court, Southern District of New York, and served by first-class mail to all counsel on the attached service list.

DAVID A. ROSENFELD

Kellwood – Service List
06/25/09

Plaintiffs –

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
Samuel H. Rudman
David A. Rosenfeld
Joseph Russello
58 South Service Road, Suite 200
Melville, New York 11747
Telephone:  631/367-7100
631/367-1173 (fax)

THE PITTMAN LAW FIRM, P.C.
AUBREY "NICK" PITTMAN
KRISTIN KAY SCHROEDER
100 Crescent Court, Suite 700
Dallas, Texas 75201-2112
Telephone:  214/459-3454
214/853-5912 (fax)

Defendants –

SILLS CUMMIS & GROSS P.C
Kenneth R. Schachter
One Rockefeller Plaza
New York, New York 10020
Telephone:  212/643-7000
212/643-6500 (fax)

# EXHIBIT A

(November 25, 2003 License Agreement)

## LICENSE AGREEMENT

This License Agreement (the "Agreement") made and entered into this 25th day of November, 2003 by and between Daryl Washington, an individual, ("Licensor"), and Kellwood Company, a Delaware corporation, ("Licensee").

WHEREAS, Licensee engages in the business of marketing and selling apparel; and

WHEREAS, Licensor engages in the business of designing, marketing and selling apparel and accessories; and

WHEREAS, Licensor is the owner of certain marks, including but not limited to, the mark listed in Item 2 of Schedule A attached hereto and incorporated herein by this reference (the "Licensed Mark"), applied for in the United States and other marks, logos and slogans for which applications for registration may in the future be made; and

WHEREAS, Licensor owns the right to grant to others the right to use and exploit the Licensed Mark; and

WHEREAS, Licensee desires to obtain the exclusive right to use the Licensed Mark in the geographic area described in Item 3 of Schedule A hereto (the "Territory"), and according to the provisions of this Agreement.

NOW, THEREFORE, in consideration of these recitals, of the following mutual covenants and other good and valuable consideration, Licensor and Licensee agree as follows:

## SECTION 1
### Grant of Rights

1.1   Exclusive Right.   Licensor hereby grants to Licensee, upon and subject to the terms of this Agreement, an exclusive license throughout the Territory to use the Licensed Mark in connection with the production, manufacture, advertising, merchandising, promotion, importation, distribution and sale of the products described in Item 4 of Schedule A, attached to and forming part of this Agreement (hereinafter referred to as "Licensed Products"). Licensor reserves the rights to sell the Licensed Products directly to universities, schools, certain approved independent retailers and through e-commerce provided that such Licensed Products shall be manufactured by and purchased from Licensee or approved in writing in advance by Licensee to be manufactured by another party. No royalties shall be due to Licensor from Licensee on the sale of such Licensed Products.

1.2   Right to Import.   Licensed Products may be manufactured outside the Territory by Licensee, solely, however, for the purpose of import to and sale in the Territory.

1.3   Licensed Products to Bear Licensed Mark.   All Licensed Products shall bear the Licensed Mark.   Licensor reserves all rights to the Licensed Mark except as specifically granted herein to Licensee and Licensor may exercise such rights at any time including, without limitation, the right to produce, manufacture, advertise, merchandise, promote, distribute and sell and to grant to third parties the right to produce, manufacture, advertise, merchandise, promote, distribute and sell any services or any products other than the Licensed Products.

Jan-09-04   11:25am   From-                                                T-027  P.003/015  F-082

1.3   Licensed Products to Bear Licensed Mark. All Licensed Products shall bear the Licensed Mark. Licensor reserves all rights to the Licensed Mark except as specifically granted herein to Licensee and Licensor may exercise such rights at any time including, without limitation, the right to produce, manufacture, advertise, merchandise, promote, distribute and sell and to grant to third parties the right to produce, manufacture, advertise, merchandise, promote, distribute and sell any services or any products other than the Licensed Products.

## SECTION 2
### Term

2.1   Initial Term. This Agreement shall be effective as of the date set forth in Item 5 of Schedule A. Unless sooner terminated as provided in this Agreement, the term of this Agreement granted hereby to Licensee shall expire on the date set forth in Item 6(a) of Schedule A hereto (the "Term").

2.2   Renewal Term. Provided that Licensee has complied with its obligations under this Agreement during the initial term, Licensee shall have the right to renew this Agreement at the same royalty rate and under the same terms and conditions for an additional three (3) year term beginning February 1, 2007 and ending January 31, 2010 by providing written notice thereof to Licensor no later than one hundred and eighty (180) days prior to the expiration of the Term.

## SECTION 3
### Manufacture of Licensed Products; Quality Control

3.1   Quality Standards. The content and workmanship of the Licensed Products shall be at all times of high quality and the Licensed Products shall be distributed and sold with packaging and sales promotion materials appropriate for products of high quality and consistent with the standards and prestige associated with the Licensed Mark.

3.2   Approval by Licensor. The styles, designs, packaging, contents, workmanship and quality of all Licensed Products shall be approved by Licensor, in writing, prior to the distribution and sale thereof.

3.3   Submission of Samples. Licensee shall deliver to Licensor for its approval, free of charge, three (3) samples of each Licensed Product, together with the tags, labels and packaging to be used in connection therewith. Upon obtaining Licensor's approval with respect to any such Licensed Products, Licensee shall commence the production and sale of such Licensed Products in the ordinary course and pursuant to the provisions of this Agreement. All Licensed Products to be sold hereunder shall be at least equal in quality to the samples approved by Licensor. Licensor and its duly authorized representatives shall have the right, upon reasonable advance notice and during normal business hours, to examine Licensed Products in the process of being manufactured.



2

T-027   P.004/015   F-062

Jan-06-04   11:26am   From-

3.4   Laws, Display of Licensed Mark.   All Licensed Products shall be manufactured, sold, labeled, packaged, distributed and advertised in accordance with all applicable laws and regulations, including, but not limited to those promulgated by the U.S. Consumer Products Safety Commission, including the Flammable Fabrics Act, if applicable.   Licensee shall use and display the Licensed Mark only in such form and manner as are specifically approved in writing by Licensor.  Licensee shall cause the Licensed Mark and such legends, markings and notices as Licensor may request to appear on all Licensed Products produced hereunder and their tags, packaging and the like and all advertising, promotional and publicity material used in connection therewith, including, without limitation, point of sale displays and similar materials and on any printed matter of any kind on which the Licensed Mark appears, including, but not limited to, business cards, invoices, order forms and stationery.   Before using or releasing any such material, Licensee shall submit to Licensor for its approval proposed advertising, promotional and publicity copy, finished artwork for tags, labels, packaging and the like and all printed matter of any kind on which the Licensed Mark appears.

3.5   Deemed Approval.   Notwithstanding anything to the contrary herein, Licensor shall be deemed to have given its approval to any matter requiring Licensor's approval if Licensor shall have failed to approve or disapprove such within five (5) working days after receipt by Licensor of a written request for its approval, together with all information reasonably relevant thereto.

3.6   Preservation of Prestige of Licensed Mark; Distribution of Licensed Products.   In order to maintain the reputation, image and prestige of the Licensed Mark, Licensee's distribution of the Licensed Products shall consist principally of department stores, specialty stores, off-price stores including clubs, sporting goods stores, mass merchandisers.  Licensee agrees that it will not use the Licensed Mark in any manner whatsoever which, directly or indirectly, would derogate or detract from its repute.

**SECTION 4**
**Showrooms**

(THIS SECTION INTENTIONALLY DELETED)

**SECTION 5**
**Licensed Mark**

5.1   Licensor's Ownership.   Licensor represents and warrants to Licensee that he is the valid owner of the Licensed Mark, that the Licensed Mark has been applied for with the United States Patent and Trademark Office, that he has the right to license the Licensed Mark with respect to the Licensed Products to Licensee, and that he has granted no other party similar rights to use the Licensed Mark.

5.2   Validity and Use.   (a)  Licensee acknowledges the validity, value and proprietary nature of the Licensed Mark including all goodwill associated therewith, whether generated by Licensor, Licensee or other licensees, and agrees that they are, and shall remain, the exclusive property of Licensor.  Licensee's use of the Licensed Mark shall inure to the benefit of

3



Licensor, Licensee shall assign and convey to Licensor any such rights to or interest in the Licensed Mark as Licensee may acquire by reason of the use thereof, including, but not limited to, any new designs or derivatives using the Licensed Mark and logo.

(b)  Licensee acknowledges that it has no right, title or interest in and to the Licensed Mark in any form or embodiment thereof and/or in the goodwill attached or which shall become attached to the Licensed Mark in connection with the business and goods in relation to which the same has been, is, or shall be used. Licensee shall not, at any time, do or suffer to be done, any act or thing which may in any way adversely affect any rights of Licensor in and to the Licensed Mark or any registrations thereof or which, directly or indirectly, may reduce the value of the Licensed Mark or detract from its reputation.

5.3  Licensee's Use of Licensed Mark as Tradename.  Licensee shall be entitled to use the Licensed Mark as a corporate division or trade name as approved by Licensor.

5.4  Infringement of Licensed Mark.  In the event that Licensee learns of any infringement or imitation of the Licensed Mark or of any use by any person of a trademark similar to the Licensed Mark, it shall promptly notify Licensor thereof. Licensor thereupon shall take such action as is necessary for the protection of its rights and of Licensee's rights, in and to the Licensed Mark. Any monetary recoveries that result from any action against an infringing party recovered by reason of a judgment or settlement, shall be split between Licensor and Licensee in accordance with the value of their respective rights in the Licensed Mark.

5.5  Licensee shall have the right to terminate this Agreement upon written notice provided to Licensor, if Licensor (i) does not successfully register the trademark "SUNDAY PLAYERS" with the U.S. Patent and Trademark Office on either the Principal or Supplemental Register or (ii) loses the right in and to the brand name/trademark "SUNDAY PLAYERS" in the United States. In the event of such termination, all earned royalties shall terminate as of the date Licensee gives its notice to Licensor and Licensor shall indemnify, defend and hold Licensee harmless from any losses related to such termination, including but not limited to, any inventory losses.

### SECTION 6
### Payments, Reports and Records

6.1  Royalty Payments.  In consideration of this Agreement granted hereunder, Licensee agrees to pay Licensor royalty payments equal to the percentage of net sales of the Licensed Products ("Net Sales") as set forth in Item 7 of Schedule A hereto during each royalty year as set forth in Item 8 of Schedule A hereto (each, a "Royalty Year"). The royalty shall be paid quarterly by Licensee within thirty (30) days following the close of each calendar quarter (each, a "Royalty Quarter").

6.2  Periodic Statements.  Licensee shall furnish Licensor, quarterly, commencing with the first Royalty Quarter (as defined in Item 8 of Schedule A) following the execution of this Agreement and continuing until a final certification of wind-up is delivered, with a statement (the "Quarterly Statement"), certified to be accurate by an authorized officer of Licensee, showing cumulatively and separately for each Licensed Products by customer the following: (a)

4



T-027   P.006/015   F-082

Jan-09-04   11:26am   From-

the line, item, design, number, description and price of the Licensed Products sold or distributed during the preceding Royalty Quarter, (b) any actual returns of the Licensed Products made during the preceding Royalty Quarter, (c) any deductions from gross sales to get to "Net Sales," and (d) the amount of payment due Licensor. Such Quarterly Statements shall be furnished to Licensor within thirty (30) days after the end of the Royalty Quarter for which such Statement is made.

6.3    A royalty payment obligation to Licensor from Licensee shall accrue upon the sale of the Licensed Product regardless of the time or collection of monies from the customer by Licensee.

## SECTION 7
### Records, Books and Accounting

7.1    Books and Records.    Licensee shall, so long as this Agreement is in effect and for three (3) years thereafter, maintain true and accurate books and records covering all transactions by it relating to this Agreement, the Licensed Products, Licensor or this Agreement.

7.2    Audit by Licensor.    Licensor shall be entitled at any time, and from time to time (but no more often than once during any Royalty Year), to have Licensee's books and records pertaining to sales of Licensed Products examined or audited with respect to any period or periods relevant to this Agreement. Licensee shall cooperate fully with the persons or entities making such examination or audit. If the examination or audit discloses that any report with respect to which the examination or audit is conducted shows an understatement of the information for such period by more than six percent (6%), Licensee shall bear the costs and expenses of such examination or audit and Licensee shall, within ten (10) days after demand by Licensor pay all such costs and expenses and all royalty payments, if any, which shall be owing based upon such a misstatement. If the examination or audit does not disclose an understatement of more than six percent (6%), Licensor shall bear the costs and expenses of such examination or audit.

## SECTION 8
### Indemnity; Insurance

8.1    Indemnity by Licensee.    Licensee hereby agrees to save and hold Licensor, Sunday Players, Inc., its partners, directors, agents, and employees and its other licensees harmless of and from and shall indemnify each of them from and against any and all losses, liability, damages and expenses (including reasonable attorney's fees and expenses) which they or any of them may incur or be obligated to pay, or for which they or any of them may become liable or be compelled to pay, in any action, claim or proceeding against them or any of them, for or by any reason of any acts, whether of omission or commission, that may be committed or suffered by Licensee or any of its servants, agents or other employees in connection with Licensee's performance of its obligations under this Agreement. The provisions of this Section 8.1 and Licensee's obligations hereunder shall survive the expiration or termination of this Agreement.

5



Y-027   P.007/015   F-062

Jan-09-04   11:28am   From-

8.2  _Licensee's Insurance._  Licensee shall procure and maintain, at its own expense, in full force and effect at all times during which Licensed Products are being sold, and for five years thereafter, with a reasonable insurance carrier acceptable to Licensor, a commercial general liability insurance policy, including products liability coverage with respect to Licensed Products, as well as contractual liability coverage with respect to this Agreement, with a limit of liability of not less than One Million Dollars ($1,000,000.00) each claim, Five Million Dollars ($5,000,000.00) in the aggregate annually.  Such insurance policy shall be written naming the Licensor, Sunday Players, Inc., its partners, agents and employees as an additional named insured for the benefit of both Licensee and Licensor.  Such insurance may be obtained by Licensee in conjunction with a policy of products liability insurance which covers products other than Licensed Products.  Licensee shall deliver a certificate of such insurance to Licensor from time to time upon the reasonable request by Licensor.

8.3  _Indemnity by Licensor._  Licensor hereby agrees to indemnify, defend and hold harmless Licensee and its officers, directors, successors and assigns from and against any and all losses, liability, damages and expenses (including reasonable attorney's fees and expenses) which they or any of them may incur or be obligated to pay, or for which they or any of them may become liable or be compelled to pay, in any action, claim or proceeding against them or any of them, for or by any reason of Licensee's use of the Licensed Mark in accordance with the terms of this Agreement.  The provisions of this Section 8.3 and Licensee's obligations hereunder shall survive the expiration or termination of this Agreement.

### SECTION 9
### Marketing and Advertising

9.1  Licensee shall promote the Licensed Products and exploit this Agreement granted herein as provided in Schedule A, Item 10.

9.2  Licensor and Licensee agree that no advertising materials submitted to Licensor by Licensee nor any advertising materials designed by Licensor under this Agreement, will impair the value and goodwill associated with the licensing program for the Property, by reason of (i) their failure to satisfy the general quality standards set forth herein; (ii) their use of artwork, designs or concepts which fail to depict accurately the Property; (iii) their use of materials which are unethical, immoral, or offensive to good taste; (iv) their failure to carry proper copyright or trademark notices; or (v) any other reasonable cause.

9.3  Licensee shall provide Licensor an inventory of samples, not to exceed a total cost of $25,000 wholesale per Royalty Year, to be used as giveaways (specifically to give away to the individuals who endorse the Licensed Products), special events, trade shows and to be displayed in a showroom.

### SECTION 10
### Confidentiality

6

T-027   P.008/018   F-062

Jan-00-04   11:26am   From-

10.1   Confidentiality by Licensee. Licensee acknowledges that all information relating to the business and operations of Licensor which it learns or has learned during or prior to the term of this Agreement, all special design concepts which Licensor provides to it and all sketches and designs received by it from Licensor are valuable property of Licensor. Licensee acknowledges the need to preserve the confidentiality and secrecy of such information, concepts, sketches and designs and agrees that, both during the term of the Agreement and after the termination hereof, it shall not use or disclose same, except as provided below and it shall take all necessary steps to ensure that use by it or by its contractors and suppliers (which use shall be solely as necessary for, and in connection with, the manufacture, distribution, sale, advertising or promotion of Licensed Products) shall preserve in all respects such confidentiality and secrecy. The provisions of this Section 10.1 shall not apply with respect to any such information, concepts, sketches or designs which may have entered the public domain through no fault of Licensee. Licensee hereby agrees to indemnify Licensor against any damage of any kind which may be suffered by Licensor as a result of any breach by Licensee of the provisions of this Section 10.1. The provisions of this Section 10.1 and Licensee's obligations hereunder shall survive the expiration or termination of this Agreement.

10.2   Confidentiality of Licensor. Licensor acknowledges that all information relating to the business and operations of Licensee which it learns or has learned during or prior to the term of this Agreement, all special design concepts which Licensee provides to it and all sketches and designs received by it from Licensee are valuable property of Licensee. Licensor acknowledges the need to preserve the confidentiality and secrecy of such information, concepts, sketches and designs and agrees that, both during the term of the Agreement and after the termination hereof, it shall not use or disclose same. The provisions of this Section 10.2 shall not apply with respect to any such information, concepts, sketches or designs which may have entered the public domain through no fault of Licensee. Licensee hereby agrees to indemnify Licensor against any damage of any kind which may be suffered by Licensor as a result of any breach by Licensee of the provisions of this Section 10.2. The provisions of this Section 10.2 and Licensee's obligations hereunder shall survive the expiration or termination of this Agreement.

## SECTION 11
### Relationship of the Parties

11.1   Independent Contractor. Nothing herein contained and no acts or assistance given or rendered by Licensor or Licensee shall be construed to constitute Licensor or Licensee as partners, joint venturers, agents or employees of each other. Licensee acknowledges that it is an independent contractor. Licensee shall not authorize any contract, agreement, warranty, representation or create any obligation, express or implied, on behalf of Licensor, and shall not otherwise hold itself out as agent or representative of Licensor nor permit any other person within its control to do so.

11.2   Licensor's Right to Sell, Transfer or Assign. In the event Licensor desires to sell its rights and interests in and to the Licensed Mark, Licensor must provide Licensee a right of first negotiation to purchase such rights and interests. Licensee shall have thirty (30) days to make a bonafide offer acceptable to Licensor. In the event Licensee purchases Licensor's rights

7



T-027   P.008/015   F-082

Jan-08-94   11:27am   From-

and interests in and to the Licensed Mark, this Agreement shall immediately terminate. If, however, Licensor sells its rights and interests in and to the Licensed Mark to a party other than Licensee, Licensee may, at its sole option, continue this Agreement or terminate this Agreement upon thirty (30) days written notice to Licensor reserving its rights under Section 12.2 hereof. If Licensor sells its rights and interests in and to the Licensed Mark without first providing Licensee with a right of first negotiation, Licensee may, at its sole option, terminate this Agreement upon written notice to Licensor reserving its rights under Section 12.2 hereof. Licensor may not assign or otherwise transfer all or any part of the rights, obligations and benefits under this Agreement or in the Trademark to another party without the prior written consent of Licensee.

11.3   Sublicense. Licensee shall have the right on its behalf with the prior approval of Licensor to sublicense its rights to manufacture, produce and distribute any Licensed Products to a third party. Licensee has adopted a Code of Conduct setting forth standards of conduct. Licensee agrees that it will, and will cause its permitted subcontractors to, abide by the principles set forth therein (as amended from time to time) in conducting all aspects of its operations as such relate to the Licensed Products.

## SECTION 12
### Breach of Agreement; Notice of Breach

12.1   Breach. In the event Licensee is in material breach of a material provision of this Agreement, Licensor shall provide written notice of such to Licensee and Licensee shall thereafter have thirty (30) days to cure such breach. If Licensee fails to cure such breach within this timeframe, Licensee shall be deemed in default of this Agreement. In the event the nature of Licensee's breach is such that it would not be possible to cure such breach within thirty (30) days, Licensee shall not be deemed to be in default of this Agreement if Licensee has commenced to cure such breach within thirty days of written notice from Licensor and thereafter works diligently to complete the cure of such breach. If Licensee fails to cure a material breach of a material provision of this agreement within the time provisions outlined, Licensor shall have the right to terminate this Agreement upon ninety (90) days prior written notice given to Licensee.

12.2   Inventory Liquidation. Upon the expiration or earlier termination of this Agreement, Licensee shall have a period of one hundred eighty (180) days within which to sell the Licensed Products on hand, in process, in transit, or on order on the date of termination and to continue on a nonexclusive basis to use the Licensed Mark in connection therewith.

12.3   Morals Clause; Inability to Publicly Appear.

(a)   If Darryl Washington personally, a member of his staff or celebrity personality used to promote the Licensed Products shall have committed or does commit any act, or shall have conducted or does conduct himself in any manner, which shall constitute an offense involving moral turpitude under federal, state or local laws, or which brings him into national public disrepute, contempt or scandal, which results in an indictment or a conviction, Licensee may terminate this Agreement upon written notice



8

Jan-09-04   11:27am   From-          T-027   P.010/015   F-096

to Licensor given at any time prior to the 30th day following the date of the indictment or conviction.

(b)      In addition, upon the death of Darryl Washington or should he be unable to publicly appear to promote the Licensed Products due to illness for a period of six (6) continuous months, Licensee shall have the right to terminate this Agreement upon thirty (30) days advance written notice.

(c)      In the event of termination of this Agreement pursuant to either subsection 12.3(a) or 12.3(b)), earned Royalties shall be payable by Licensee to Licensor with respect to any Product shipped through the date of termination and the inventory liquidation period.

The parties specifically agree that it is not the intention of the parties for this Agreement to be terminated as the result of a technical violation by either party, and the parties agree to use their respective best efforts in working together to resolve any disputes that may arise between them. Licensor acknowledges that Licensee will be investing a substantial amount of capital in the infrastructure of this program and that Licensee will be given every reasonable opportunity to continue with this license as long as it is using its best efforts to comply with this Agreement and cure any breaches by Licensee that arise during the term hereof.

## SECTION 13
### General Provisions

13.1      Consent to Jurisdiction. The parties submit to the exclusive jurisdiction of the courts located in New York, New York (both Federal and state) for any actions relating to this Agreement and the transactions contemplated hereby (and Licensee agrees not to commence any action relating thereto except in such courts), and further agrees that service of any process, summons, notice or document by registered mail to Licensee shall be effective service of process for any action brought against Licensee in any such court.

13.2      Validity. If any provision of this Agreement shall be invalid or unenforceable either in its entirety or by virtue of its scope or application to given circumstances such provision shall be deemed modified to the extent necessary to render the same valid or as not applicable to given circumstances, or deemed to be excised from this Agreement, as the situation may require. This Agreement shall be construed and enforced as if such provision had been included herein as so modified in scope or application or had not been included herein, as the case may be. In the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section 13.2 shall operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision.

13.3      Notices. (a) Any notices, reports, requests or demands to be given by either party to the other under the provisions of this Agreement shall be forwarded by Facsimile transmission with receipt confirmed by telephone, or by certified or registered air mail, or overnight courier,

9



charges prepaid, to the telephone numbers and addresses as set forth in Item 12 of Schedule A hereto.

All notices, reports, requests or demands shall be deemed given on: (i) the date any such facsimile transmission is received and confirmed; (ii) three (3) days after deposit in U.S. mails if sent by certified or registered mail; and (iii) one (1) day after deposit with overnight courier.

(b)     The parties hereto may change the address for notices by notice of change of address given in the manner provided in the above paragraph.

13.4    Entire Agreement.    This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and all prior understandings and agreements between the parties hereto relating to the subject matter hereof are hereby superseded. This Agreement may be modified only by a writing signed by all parties to be bound by the modification.

13.5    Controlling Law.    This Agreement, including all matters relating to the validity, construction, performance and enforcement thereof, shall be governed by the laws of the State of New York applicable to agreements wholly made and to be performed therein.

13.6    Counterparts.    This Agreement may be executed in any number of identical counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same document.

13.7    Survival.    The representations, warranties, covenants, obligations and indemnities of Licensee contained in this Agreement or in any ancillary document referred to hereunder shall survive the termination of this Agreement.

IN WITNESS WHEREOF, Licensor and Licensee have caused this Agreement to be executed and entered into as of the date hereinabove set forth.


Licensor:

DARYL WASHINGTON

By:

Name:  Daryl R. Washington

Title:  President


Licensee:

KELLWOOD COMPANY

10

T-027   P.012/015   F-062

Jan-08-04   11:27am   From-

By: *[signature]*
Name: Hal T. Upbin
Title: Chairman

11

T-027  P.013/016  F-062

Jan-08-04  11:28am  From-

SCHEDULE A
TO
LICENSE AGREEMENT

Item 1.  Name of Licensor and Licensee:

Licensor:  Daryl Washington

Licensee:  Kellwood Company

Item 2.  Licensed Marks:  Sunday Players® (Registration No. 2722418)
Sunday Players™ (Serial No. 7642103)

Item 3.  Territory:  United States, its territories and possessions

Item 4.  Licensed Products:  Men's and Women's and Children's Apparel and Accessories (including, but not limited to, athletic uniforms, head bands, neck bands, wrist bands, sweat bands, boxer shorts, golf shirts, gym shorts, gym suits, head wear, namely caps and hats, jackets, jerseys, jogging suits, knit shirts, sweat pants, sweat shirts, under shirts, sport shirts, sweat shorts, socks, warm-up suits, t-shirts, tank tops)

Item 5.  License Effective Date:  Date of Execution

Item 6.(a)  Date of Expiration:  January 31, 2007

Item 6.(b)  Renewal Terms:  See Section 2.2 of this Agreement.

Item 7.  Royalties:

Licensee agrees to pay to Washington a five percent (5%) royalty of Net Sales of the Licensed Products.

"Net Sales" shall mean the gross invoice or contract price charged for Licensed Products by Licensee, less only (i) freight charges and taxes separately billed on the face of the invoice; (ii) ordinary and customary trade discounts; (iii) amount of any refunds and credits for returns of Licensed Products actually paid to or taken by customers and allowed by Licensee; (iv) credits, or allowances, if any, granted in accordance with standard industry practice as an accommodation to customers in the nature of ordinary and customary "markdown chargebacks" or "stock adjustment returns", (v) actual discounts for prompt payment by retailers; and (vi) overbillings. In computing Net Sales, no costs incurred in manufacturing, selling, advertising or distributing the Licensed Products and no indirect expenses shall be deducted, nor shall there be any deduction for uncollectible accounts.

Item 8.  Royalty Years and Royalty Quarters: As used herein, a "Royalty Quarter" shall mean a fiscal quarter.  The first Royalty Quarter shall commence on the date

hereof and end on January 31, 2004.  In subsequent Royalty Years, the first Royalty Quarter shall begin on February 1 and end on January 31.

As used herein, a "Royalty Year" shall mean the Year commencing February 1 and ending January 31 except that the first Royalty Year shall commence on the date hereof and end January 31, 2005 ("Royalty Year 1").  "Royalty Year 2" shall mean February 1, 2005 – January   31, 2006.  "Royalty Year 3" shall mean February 1, 2006 – January 31, 2007.

Item 10.       Marketing Obligation:

Licensee shall expend an amount equal to three percent (3%) of Net Sales of the License Products towards marketing of the brand, including, but not limited to, promotional events, trade shows, cooperative advertising and samples.

Item 11:       Payment Information:

All payments on account of royalty payments shall be sent to the following address:

       Daryl Washington
       14001 Dallas Pkwy, Suite 1200
       Dallas, TX 75240

Item 12.       Addresses for Notices:

To Licensee:

       Kellwood Company
       120 W. 45th Street
       New York, NY 10036
       Attention: Robert C. Skinner

       Facsimile No. (212) 764-6643

with a copy to:

       Kellwood Company
       600 Kellwood Parkway
       Chesterfield, MO  63017
       Attention: Legal Department

       Facsimile No. (314) 576-3388

To Licensor:

       Daryl Washington
       14001 Dallas Pkwy, Suite 1200
       Dallas, TX 75240

Item 13.  Future Products.   In the event Licensor enters into any license agreement with MTV granting rights to produce, manufacture, promote, distribute and sell any audio and/or home entertainment products, (i.e. cd's, workout, training and other instruction type videos or dvd's), Licensor and Licensee agree to negotiate and execute a written agreement outlining the terms and conditions relating to the payment of a royalty to be determined in a subsequent agreement.

# EXHIBIT B

(July 29, 2004 email acknowledgement)

Subj:   Kellwood/Sunday Players
Date:   7/28/2004 3:35:01 PM Central Standard Time
From:   RickPeterson@kellwood.com
To:     gthsport@aol.com, carlcsf@aol.com, sfink57@aol.com, chiler@dalcoathletic.com,
        mprice173@aol.com, ratking@aol.com, rjcsales@libcom.com, mkatking@aol.com,
        rtsports@earthlink.net, silenard.earthlink@kellwood.com, tadpelletier@comcast.net,
        tonym6190@att.net, valspiller@aol.com, wjackson@dalcoathletic.com, wparaside@aol.com
CC:     Greg.Dorf@Kellwood.com, TaraFiege@kellwood.com, Trish.Webber@Kellwood.com,
        DKWASHLAW@aol.com

Hello Everybody,

By now I hope you have all been informed that Kellwood Company will be
taking over the day to day operations of Sales, Marketing, Distribution and
Customer Service for Sunday Players. Kellwood is the official licensee for
all Sunday Players apparel and accessories. Daryl Washington continues to
be the owner and President of the Sunday Players brand and will be
concentrating his efforts in the areas of public relations, brand
promotion, licensing, etc. and will remain very involved in all aspects of
the business.

We are in the process of consolidating inventory into the Kellwood
Distribution Center located in Fernwood, MS and will let you know when that
has been completed. We will also be preparing new sales and marketing
materials to be distributed as soon as they are available.

The main purpose of this Email is to introduce the Kellwood/Sunday Players
Team:

Rick Peterson
National Sales Manager
Tel: (212) 575-7415
rick_peterson@kellwood.com

Greg Dorf
VP Kellwood Activewear
Tel: (212) 575-7492
greg_dorf@kellwood.com

Tara Fiege
Associate Sales Coordinator
Tel: (212) 575-7481
tara_fiege@kellwood.com

Rick, Greg & Tara all have the same fax # (212) 764-6643

and are all located at:

Kellwood Activewear
120 West 45 street - 27th Floor
New York, NY 10036

Trish Webber
Account Manager
Tel: (601) 276-6041
trish_webber@kellwood.com

Trish is located at our offices in Summit, MS and will be coordinating
order processing and inventory programs.
Trish's mailing address and the address for mailing POs is:
Keliwood Activewear
P.O. Box 870
McComb, MS 39649
Fax: (601) 276 - 5037

We look forward to working with you and building a successful Sunday
Players business.

Regards,

Rick