UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

DARYL K. WASHINGTON, et al.,

                                    Plaintiffs,                    05-CV-10034 (SN)

                -against-                                          OPINION & ORDER

KELLWOOD COMPANY,

                                    Defendant.

----------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: __ 7/15/2016         │
└─────────────────────────────────┘
```

SARAH NETBURN, United States Magistrate Judge:

     Daryl Washington and his start-up company Sunday Players sued Kellwood Company

for breaching an exclusive licensing agreement to manufacture, market, and promote sporting

apparel under the Sunday Players brand name. On summary judgment, the Court found that

Kellwood breached the agreement by terminating it early and by failing to provide free product

samples to Washington and Sunday Players (collectively, "plaintiffs" or "Sunday Players"). Trial

was held to determine whether Kellwood breached in a third way, by failing to make reasonable

marketing efforts before terminating the agreement. The jury found Kellwood liable and

calculated as damages $4,350,000 in lost profits or, alternatively, $500,000 in lost value. Sunday

Players opted to claim the larger verdict.

     Kellwood now renews its trial motion for judgment as a matter of law and moves in the

alternative for a new trial. Sunday Players moves for a new trial on limited issues. The Court

concludes that Sunday Players proved that Kellwood breached its obligation to use reasonable

marketing efforts, but that the lost profits verdict was too speculative and should be set aside as a

matter of law. Sunday Players did not prove that its new and untested business would have

achieved vast market success but for Kellwood's breaches. Sunday Players did, however, prove that it lost business value. But because the jury's lost value verdict relied on the same speculative evidence projections as its lost profits verdict, the Court will order a new trial on damages. Accordingly, Kellwood's motion is granted in part, judgment is vacated with respect to damages, and a new trial shall be held to establish lost business value damages. Should this Order be vacated or reversed, Kellwood's motion for a new trial is conditionally granted with respect to damages only. All other relief is denied.

## BACKGROUND

In 2002, Daryl Washington started a sports apparel company that marketed compression wear to football players. Compression wear is made of close-fitting, stretchable fabric that regulates moisture and body temperature. At the time, the compression wear market was rapidly expanding following the success of Under Armour. Washington thought he could compete with Under Armour because he had access to professional football players through his business partner Izell Reese, an NFL defensive back, and because his clothing designs were superior. Washington branded his product with the logo and name of his fledgling sports agency, Sunday Players.

Sunday Players did not have any manufacturing facilities, so Washington turned to Kellwood Company, one of the world's largest "private label" clothing manufacturers. Like other private label manufacturers, Kellwood made clothes that retailers could sell under their own brand names. Washington approached Kellwood because its performance apparel division already made compression apparel for its private label clients. Kellwood's performance apparel division was a subdivision of its intimate apparel division, which made women's undergarments. Compression wear and women's undergarments both require stretchy material and flat stitching,

and Kellwood made both at the same Honduran factory. Kellwood, through performance division executive Greg Dorf, agreed to produce an initial run of Sunday Players garments.

Kellwood had a corporate strategy of hedging against the loss of private label clients by controlling its own stable of brand names. In 2002, Kellwood had long-term licensing deals with many famous brands and had recently bought the brand Phat Fashions for around $140 million. Dorf wanted to control Sunday Players so that the performance apparel division would have its own brand. He saw promise in the Sunday Players brand name, which referred to the day of the week when NFL games are played, and in the brand's connection to NFL players who could endorse its products. He began negotiating a licensing deal with Washington, but the two sides made little progress for months.

While negotiations proceeded, Washington and his associates marketed Sunday Players by attending trade shows, publishing a product catalog, and making personal sales calls. They made small sales to local high schools, colleges, and retail stores. Relying on his cachet as a professional athlete, Reese introduced the product to customers, and a small sales team closed the deals. Meanwhile, Reese discussed Sunday Players in NFL locker rooms to generate excitement and develop new designs.

In August 2003, Dorf met Angela Jackson, a retail marketing executive at MTV. Dorf showed her samples of Sunday Players merchandise and introduced her to Washington and Reese. She was impressed that an NFL player was involved in Sunday Players and saw potential in Kellwood's size and relationship with major retailers. (Dorf had led her to believe that Kellwood already held an exclusive license to market the brand.) Her research staff agreed that Sunday Players could appeal to both customers and retailers. Based on their research, she began negotiating a licensing deal with Kellwood. According to Jackson, MTV discussed producing a

Sunday Players advertisement, placing Sunday Players products on its TV shows, and integrating

the brand into its promotional events. She approximated the value of this marketing at two

million dollars.

Dorf told Washington about MTV's interest, and licensing negotiations between

Kellwood and Sunday Players intensified. According to Washington, Kellwood initially asked to

buy Sunday Players outright. When Washington refused to sell, Kellwood asked to license the

brand for five years with a five-year renewal. When Washington refused that offer, the parties

settled on an initial three-year term with a three-year renewal, which only Kellwood could

exercise. The MTV deal figured prominently in the licensing negotiations, and Washington was

under the mistaken impression that Kellwood had already sealed it.

In November 2003, Washington and Kellwood signed a License Agreement giving

Kellwood an exclusive license to use the Sunday Players mark "in connection with the

production, manufacture, advertising, merchandising, promotion, importation, distribution and

sale" of apparel. ECF No. 191-12 at 2 (License Agreement). There was a carve-out allowing

Washington to market Sunday Players "directly to universities, schools, certain approved

independent retailers, and through e-commerce . . . ." Id. The contract had an initial term of three

years and gave Kellwood, but not Washington, the right to renew for an additional three years.

Washington would be entitled to five percent royalties of all net sales, but the contract did not

guarantee any minimum payment. The contract promised Washington an inventory of samples

not to exceed $25,000 per year "specifically to give away to the individuals who endorse"

Sunday Players products. Id. at 7. In Section 9.1 and its accompanying appendix, Kellwood

agreed to promote the products by spending "an amount equal to three percent . . . of Net Sales

of the License Products towards marketing of the brand, including, but not limited to,

promotional events, trade shows, cooperative advertising, and samples." Id. at 14. The agreement did not give either party an early termination right. It required Sunday Players to give written notice of any breach and allowed Kellwood 30 days to cure.

Dorf and his associate Rick Peterson were the only Kellwood executives assigned to market Sunday Players. They did not market Sunday Players directly to consumers or to sports teams, and signed no athletes to endorsements. Peterson took the view that Kellwood should not advertise or market directly to consumers until Sunday Players merchandise was in stores, and he marketed directly to retailers. He tried without success to sell to May Company, Olympia Sports, Modell's, Marshall Field, and others.

Sunday Players took a different view about how to market its products. Before the License Agreement, Christopher Plumlee was in charge of the brand's marketing strategy. He had experience as a bank branch manager, salesman for Eastman Kodak, and vice president of sales for office supply companies, computer companies, and a document management company. He had no experience marketing apparel, but he agreed to join Sunday Players because of his close relationship with Washington. Plumlee believed that Sunday Players should emulate Under Armour's marketing strategy. After studying Under Armour, he concluded that "from a marketing perspective . . . if you could get the product in the hands of athletes that are going to be appearing on T.V., obviously the kids are influenced by that." Tr. at 574. He wanted to pursue a "top-down and a bottom-up approach" to marketing. Id. at 577. The "top-down" approach consisted of athlete endorsements and television advertising. The "bottom-up" approach consisted of what he characterized as "[guerilla] marketing": sponsoring local sports teams, giving out free products, and doing direct consumer marketing through Facebook and other social media. Id. at 577-79. Plumlee felt frustrated that Kellwood refused to pursue his marketing

strategy. At the same time, he believed that the exclusive license prevented Sunday Players from doing its own marketing, except to select small retailers and schools. Those efforts yielded meager returns, in part because a later contract amendment rescinded Sunday Players's right to market directly to any customers. Between November 2003 and April 2005, Sunday Players and its stable of sales representatives sold less than $150,000 of merchandise.

Meanwhile, MTV and Kellwood came to terms on a sublicensing deal. In a March 2004 draft contract, MTV agreed to produce a Sunday Players television commercial after Kellwood reached a certain sales threshold and paid a $50,000 fee, but MTV would not be obliged to air the ad until Kellwood had sold $500,000 worth of Sunday Players merchandise. (Jackson testified that MTV had agreed to forgo half of that fee when negotiations stalled.) Kellwood did not send Washington the draft contract, but Jackson did. Despite pressure from Washington and from MTV itself, Kellwood never signed the contract, and the deal was not made.

In March 2005, Kellwood unilaterally terminated the License Agreement. It had sold no Sunday Players merchandise and had done no direct consumer marketing. Shortly thereafter, Kellwood closed its intimate apparel division, its performance apparel division, and the Honduran factory where it made both women's undergarments and compression apparel.

According to Washington, Kellwood's early termination "destroyed the brand," and effectively put Sunday Players out of business by leaving it without any manufacturing or marketing resources. Tr. at 225-27. By letter, Washington protested the early termination on the ground that the contract did not have a termination provision. He also argued that Kellwood had not fulfilled its obligation to market Sunday Players because it failed to sign the MTV agreement, buy any other advertising, or get the product into stores. Kellwood did not respond, and Washington brought this lawsuit.

On summary judgment, the Court ruled that Kellwood breached the License Agreement by terminating early and by failing to provide adequate promotional samples. The parties went to trial to determine whether Kellwood breached in a third respect, by failing to use reasonable efforts to promote Sunday Players, and to establish damages.

Sunday Players relied on the expert valuation testimony of Scott Barnes to prove damages. He based his valuation of Sunday Players on Under Armour's historic sales performance because he believed that the companies had similar products, manufacturing capability, retail distribution, business strategies, and brand philosophy. Barnes also noted that Under Armour's growth increased significantly after 2003, when it aired its first television commercial and began a marketing agreement with ESPN. Barnes assumed that Kellwood's MTV opportunity was more or less the equivalent of the ESPN deal and would lead to similar success. Based on these similarities, Barnes concluded that Under Armour would be a good benchmark for establishing the profits Sunday Players would have earned had Kellwood adequately marketed the product. Barnes testified that between 2005 and 2007, Sunday Players would have achieved 50 percent of the sales that Under Amour achieved between 2002 and 2004. Barnes used the 50 percent discount rate to account for Under Armour's dominance of the market and rising competition from Nike, Reebok, Adidas, and other brands. Based on this analysis, Barnes concluded that Kellwood would have sold more than $82,000,000 of Sunday Players merchandise during the term of the license agreement. He calculated that Sunday Players therefore lost royalty income of $213,000 between the contract's inception and its early termination and $3,570,000 from termination until the end of the contract term. He also calculated that Sunday Players lost $532,500 in brand value, calculated as of March 2005.

Following the close of evidence, Kellwood moved under Rule 50(a) for a judgment as a matter of law on two grounds. First, the plaintiffs had not proven that Kellwood breached any contractual obligation to market and promote Sunday Players. According to Kellwood, "the license agreement's language is explicit and unambiguous that . . . Kellwood shall spend 3 percent of gross sales" on marketing, and Kellwood met that obligation. Tr. at 1221. Second, the plaintiffs had "provided no foundation for Mr. Barnes's assumption that if reasonable marketing efforts had been made that Sunday Players would have sold at 50 percent of Under Armour at a comparable stage of development." Id. at 1223. Accordingly, Sunday Players had not proven that any breach by Kellwood had caused damages.

The jury returned a verdict in favor of the plaintiffs and concluded that Kellwood breached the contract by failing to use reasonable marketing efforts. It awarded $250,000 in lost profits between November 25, 2003, and March 14, 2005; $4,100,000 in lost profits between March 14, 2005, and January 31, 2007; and, alternatively, $500,000 in lost market value as of March 14, 2005. The plaintiffs elected to collect lost profits, rather than lost value, and the Court entered judgment. These cross-motions followed.

## DISCUSSION

### I.      Standards of Review

Federal Rule of Civil Procedure 50 authorizes the Court to grant a motion for judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1), (b). The Court may grant such a motion only where there is "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture" or "there is an overwhelming amount

of evidence" in the movant's favor. <u>Bucalo v. Shelter Island Union Free Sch. Dist.</u>, 691 F.3d 119, 127-28 (2d Cir. 2012) (internal quotation marks omitted). In considering a Rule 50 motion, the court "may not weigh the credibility of witnesses" or "consider the weight of the evidence." <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks omitted). Indeed, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000). When reviewing a motion under Rule 50(b), the Court may "allow judgment on the verdict," "order a new trial," or "direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b)(1)-(3).

The standard for granting a new trial under Rule 59 is more lenient. "On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411, 418 (2d Cir. 2012). The district court may grant a Rule 59 motion even when substantial evidence supports the jury's verdict "if the court is convinced that the verdict was manifestly erroneous." <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 246 (2d Cir. 2003).

## II.    Judgment as a Matter of Law

### A.    Reasonable Efforts Before the Breach

Kellwood argues that it fulfilled its obligation to market and promote Sunday Players during the period before it terminated the License Agreement. The Court disagrees.

Under New York law, an exclusive licensee's promise to pay a royalty on licensed sales is "a promise to use reasonable efforts to bring profits and revenues into existence." <u>Wood v. Lucy, Lady Duff-Gordon</u>, 222 N.Y. 88, 92 (1917) (Cardozo, J.). This obligation arises from the structure of a licensing agreement. When a company licenses the exclusive right to use its brand,

the only thing that company expects in return is a share of the profits. If there are no profits, the licensor gets nothing. Profits can never be guaranteed, but an exclusive license requires the licensee to make efforts that give the licensed product "a reasonable chance of achieving market success. . . ." Zilg v. Prentice-Hall, Inc., 717 F.2d 671, 680 (2d Cir. 1983). Because Kellwood had an exclusive contract to market and promote Sunday Players, it had an obligation to make reasonable efforts to give the brand a chance of market success.

Kellwood argues that Section 9.1 of the License Agreement displaced any implied obligation to use reasonable efforts by requiring marketing expenditures in "an amount equal to three percent . . . of Net Sales" of Sunday Players merchandise. 191-12 at 14. According to Kellwood, the explicit language of the contract should control, and the lack of net sales meant that it was not obligated to spend anything to market Sunday Players.  Alternatively, Kellwood argues, any ambiguity in Section 9.1 presented a question of fact for the jury.

The interpretation of Section 9.1 was a question of law, not a question of fact. Under New York law, "the interpretation of an unambiguous contract is a question of law." New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 111 (2d Cir. 2006). Section 9.1 is *not* ambiguous; it clearly obligates Kellwood to spend three percent of net sales on marketing. The question is whether such an express obligation relieved Kellwood of its legal responsibility to use "reasonable efforts" under New York law. This is a legal question, and, for the reasons that follow, the answer is no.

The law requires licensing contracts to guarantee a reasonable shot at profits, and express limitations on marketing expenditures cannot foil that guarantee. In Contemporary Mission, Inc. v. Famous Music Corp., a group of Roman Catholic priests licensed the right to market the rock opera *Virgin*, which they expected to rival *Tommy* and *Jesus Christ Superstar*. As the contract

required, the defendant spent $50,000 to market *Virgin*. Nonetheless, the Court of Appeals

concluded that the defendant "had an obligation to use its reasonable efforts to promote [*Virgin*]

on a nationwide basis. That obligation could not be satisfied *merely by technical compliance*

with the spending and appointment requirements" of the agreement. Contemporary Mission, Inc.

v. Famous Music Corp., 557 F.2d 918, 923 (2d Cir. 1977). Accordingly, the jury could find that

the defendant had not met its obligation to market the rock opera even though it had spent the

contractual minimum on marketing. Id.

Similarly, in Zilg, the plaintiff sought to publish a book about the role of the DuPont

family in American history. The publishing contract required the defendant to "exercise its

discretion in good faith in planning its promotion of the Book, and in revising its plans." Zilg,

717 F.2d at 676. The Court of Appeals ruled that the clause was unenforceable because

otherwise "authors would be guaranteed nothing but whatever up-front money had been

negotiated, and the promise to publish would be meaningless." Id. at 680. Instead, the "promise

to publish must be given some content and that it implies a good faith effort to promote the book

including a first printing and advertising budget adequate to give the book a reasonable chance of

achieving market success in light of the subject matter and likely audience." Id.

Contemporary Mission and Zilg both held that express limitations on marketing

obligations do not dampen a licensee's obligation to use reasonable marketing efforts. These

conclusions are consistent with Wood, which held that an exclusive marketing promise *entails* an

obligation to use reasonable efforts. A contractual provision that would limit a licensee's

obligations to something less than reasonable efforts would render the promise illusory.

Nothing distinguishes this case from Contemporary Mission and Zilg. If Kellwood

promised to spend only three percent of sales and that were not enough to offer a chance at

market success, then Kellwood's promise was illusory. The jury was free to decide whether Kellwood's efforts were sufficient under the law.

But even assuming that Section 9.1 displaced Kellwood's obligation to use reasonable efforts, it did not relieve Kellwood of the obligation to spend money. The contract does not require Kellwood to wait until sales have been made before spending on marketing. That interpretation would render the contract an absurdity. Marketing comes before sales. Under Kellwood's interpretation, a party could terminate a licensing agreement before making any sales and then disclaim any obligation under the contract. But that interpretation runs contrary to Wood, which requires courts to read concrete obligations into marketing contracts. Accordingly, the jury was free to determine whether Kellwood's pre-termination efforts were sufficient to give Sunday Players a reasonable chance of market success.

The jury heard ample evidence that Kellwood's efforts were not reasonable. The jury heard evidence that Kellwood did not accept MTV's offer of more than two million dollars' worth of promotional screen time, that it had refused to execute the fully drafted MTV agreement, and that Kellwood's team of two executives did absolutely no direct consumer marketing. Given the fact that Kellwood did not sell *any* Sunday Players apparel, the jury could have concluded these other marketing steps should have been taken. The Court concludes that the jury's liability finding was not erroneous as a matter of law.

### B. Lost Profits

Kellwood argues that the lost profits award should be set aside because it was not based on sufficient evidence. According to Kellwood, Sunday Players failed to prove that Kellwood's breaches caused lost profits. The Court agrees.

Under New York contract law, a plaintiff can recover lost profits only when they were caused by the breach, can be proven "with reasonable certainty," and "were fairly within the contemplation of the parties to the contract at the time it was made." Kenford Co., Inc. v. Cnty. of Erie, 67 N.Y.2d 257, 261 (1986). Lost profits need not "be determined with mathematical precision," but they must "be capable of measurement based upon known reliable factors without undue speculation." Ashland Mgmt., Inc. v. Janien, 82 N.Y.2d 395, 403 (1993). A plaintiff must provide a "stable foundation for a reasonable estimate" of lost profits, or the claim "fails for uncertainty." Freund v. Washington Sq. Press, Inc., 34 N.Y.2d 379, 383 (1974).

Past sales can furnish a stable foundation for estimating lost profits. "The owner of an established business may have it in his power to establish with reasonable certainty the amount of capital invested, the monthly and yearly expenses of operating his business, and the daily, monthly or yearly income he derived from it for a long time" before a contract breach, "thereby furnishing a reasonably correct estimate of the nature of the legal injury and the amount of damages which resulted therefrom." Cramer v. Grand Rapids Show Case Co., 223 N.Y. 63, 68 (1918). Thus, "evidence as to the actual sales" made before a contract breach, can be a basis for extrapolating future profits. Care Travel Co., Ltd. v. Pan Am. World Airways, Inc., 944 F.2d 983, 994 (2d Cir. 1991). So can projections of future profits based on the prior success of a licensing agreement. See S&K Sales Co. v. Nike, Inc., 816 F.2d 843, 852 (2d Cir. 1987).

By contrast, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (McLaughlin, J.). A company without past sales can prove lost profits by identifying a comparable company and analyzing that company's actual profit history. See Kenford, 67 N.Y.2d at 261. Profits of another entity are relevant only when "plaintiff's

business bears a close comparison to the proposed business, the products or services involved are standardized, and the profits do not depend heavily on local or personal management skills." Schonfeld, 218 F.3d at 174 (quoting 3 Dobbs Law of Remedies at § 12.4(3)) (internal quotation marks omitted).

Sunday Players lacked a track record from which to prove the existence of lost profits. Before the License Agreement, Sunday Players was a start-up business with no capital or manufacturing capacity, no national advertising, and no long-term deals with retailers. It had no brand recognition and meager sales, less than $200,000 total. Washington signed the License Agreement to gain the advantage of Kellwood's capital and manufacturing capacity, its incipient deal with MTV, and its relationship with retailers. Washington hoped that these advantages would bring brand recognition—and profits. But, as a new business, Sunday Players had no basis for knowing how the market would receive its product. Without a meaningful history of past sales, Sunday Players's claim for lost profits must be viewed with skepticism.

Sunday Players argues that its damages claim should not be viewed skeptically because its venture was not a "new business." According to the plaintiffs, Sunday Players and Kellwood became, in effect, a joint entity when they entered the License Agreement. Sunday Players argues that the Court should take into account Kellwood's long history in the garment marketplace, market capitalization, access to retailers, and track record of sales when evaluating the lost profits of what the plaintiffs style "Kellwood/Sunday Players." See Pls.' Mem. of Law, ECF No. 201 at 30-33.

Sunday Players misunderstands the purpose of giving added scrutiny to new ventures. In New York, lost profits must be "capable of measurement," Ashland, 82 N.Y.2d at 403, and founded on a "stable foundation," Freund, 34 N.Y.2d at 383. Because lost future profits are by

necessity speculative, a past track record provides an inductive basis for proving that they would have been earned. The sun rose yesterday, and so it will rise tomorrow. A business made a predictable profit for the past three years, and so it will make the same profit this year—barring some intervening event like a breached contract. Whether viewed as an isolated entity, or as one half of the new "Kellwood/Sunday Players" venture, Sunday Players had no track record of profits and no basis for making such an induction. True, Kellwood had a history of selling compression apparel to its private label clients. But the evidence at trial showed that the market for private label and the market for branded apparel were not the same. In fact, it was a minor theme of the plaintiffs' case that Kellwood wanted to buy Sunday Players because the economics of brand marketing were so different. There is no basis to conclude that Kellwood's success in selling compression apparel to its private label clients would translate into success selling branded sports apparel. Kellwood's history and success at private label marketing provided no historical track record to show lost profits.

Without such a track record, Sunday Players could prove lost profits only by reference to a comparable business. See Kenford, 67 N.Y.2d at 261; Schonfeld, 218 F.3d at 174. Comparable businesses, however, can rarely provide a stable basis for a damages calculation because "the ultimate conclusions are still projections" that rely on "known or unknown factors." Kenford, 67 N.Y.2d at 262. Almost inevitably, some crucial difference between the two ventures will make comparison inapt and, thus, legally insufficient. For example, a movie theater on one side of town cannot serve as a yardstick for a theater on the other side because their traffic and proximity to competitors were different. See Broadway Photoplay Co. v. World Film Corp., 225 N.Y. 104, 109-10 (1919) (Cardozo, J.). Nor can an existing cable channel serve as a yardstick for a cable channel that never got started. See Schonfeld, 218 F.3d at 174.

This case is no different. Sunday Players chose Under Armour as a comparator, but the choice has three fatal flaws. First, Sunday Players could not show causation—it did not prove that it would have made a profit simply by mimicking Under Armour's marketing strategy. Second, Sunday Players could not use Under Armour's historical sales to prove lost profits to a reasonable certainty because the businesses were too different. Finally, Sunday Players did not prove that the amount of claimed lost profits were within the contemplation of the parties at the time of the contract. As a matter of law, Sunday Players's damages theory relied on "speculation and conjecture" and could not support the jury's verdict. Kenford, 67 N.Y.2d at 262.

A district court "only can grant the Rule 50(b) motion on the grounds advanced in the preverdict motion, because the former is conceived of as only a renewal of the latter." 9B Wright & Miller, Fed. Prac. & Proc., § 2537. In its preverdict motion, Kellwood attacked both Barnes's damages calculation and the theory of causation that supported it. Kellwood has abandoned its attack on Barnes's damages calculation in its Rule 50(b) motion, opting instead to focus on the lack of causation evidence. The Court, therefore, arguably should not address Barnes's testimony in its Rule 50(b) analysis. But the insufficiency of the causation evidence is inextricably linked to the insufficiency of the damages evidence. The Court's analysis cannot be fully understood without a discussion of both, and the Court's decision to order a new damages trial cannot be understood without a complete discussion of Barnes's testimony. Regardless, any error the Court might make in addressing the damages evidence under Rule 50 would be harmless in light of the Court's conditional decision to grant a new damages trial under Rule 59.

## 1.    Causation

Sunday Players's damages theory required the jury to believe that it would have made profits if Kellwood had only finalized the MTV deal, signed athletes to endorsements, and

marketed directly to consumers through the internet. According to the plaintiffs, this strategy would have worked for Sunday Players because it worked for Under Armour. But no evidence showed how this marketing plan would have affected sales, and no testimony established how much marketing would have been required to penetrate the compression apparel market. Even assuming that Kellwood had signed the MTV agreement, the agreement required Kellwood to sell $500,000 worth of Sunday Players apparel before MTV would air any advertising, and the plaintiffs presented no evidence that those sales would have been made. And even if Kellwood had accepted MTV's offer of free product placements, and done direct consumer advertising, there was no evidence that those efforts would have led to sales.

Sunday Players presented little evidence about the effectiveness of marketing. They had no marketing expert. Plumlee gave lay opinion testimony about marketing, but he gave no specific evidence to support a conclusion that Sunday Players would have made money had Kellwood made reasonable marketing efforts. According to Plumlee, "if you could get the product in the hands of athletes that are going to be appearing on T.V., obviously the kids are influenced by that." Tr. at 574. But he did not say how often the athletes would have to appear or on what channels. He thought that an MTV ad would reach the "demographic that we were targeting," but he presented no research to suggest how successful an MTV ad campaign would be. Tr. at 581. He testified that Under Armour succeeded by mixing "top-down" athlete endorsements and national advertising with "bottom-up" efforts like sponsoring college teams and doing direct consumer research. But he had no data on how much marketing Under Armour did before it became profitable, how much that marketing cost, or where it was targeted. He presented no data about the state of the market after Under Armour's rise, and he had no basis for concluding that a company could break into the compression apparel market simply by

following the same path that Under Armour had already taken. Without those specifics, the jury had no basis for measuring any profits that Plumlee's marketing strategy would have produced.

Sunday Players argues that Jackson's testimony established that Plumlee's marketing strategy would have led to profits, but her testimony was just as vague as his. She testified that MTV would have placed Sunday Players advertisements on CTN, a network that was distributed to 730 colleges. According to Jackson: "If you think 730 colleges, Wal-Mart is probably in every one of those locations. So we would be driving kids right off of those campuses directly into retail, and that is what we were sharing with retailers." Tr. at 450. But Jackson gave no data regarding the viewership of CTN or the effectiveness of advertising that had been placed on the network. She gave no testimony indicating what volume of sales, if any, could be attributed to advertisements on MTV networks, or how a campaign that relied solely on MTV advertising would fare. She testified that MTV "could build this into a household name," but she never explained how. Tr. at 465. The plaintiffs argue that her testimony showed that consumers and retailers were ready to buy Sunday Players products as soon as the advertisements aired, but she gave no direct testimony of that fact. Her testimony regarding consumer surveys and retailers' interest in the brand was hearsay, and the Court directed the jury to consider it only for the effect on MTV and warned that it "should not consider that testimony as any evidence of what these people in the consumer surveys or what the retail stores would have done or what they actually said." Tr. at 494. In short, Jackson's testimony provided no basis for inferring lost profits.

Ultimately, too many "known or unknown factors" prevented the jury from concluding that Kellwood caused lost profits by failing to recycle Under Armour's marketing strategy. Kenford, 67 N.Y.2d at 262. Even if Kellwood had signed the MTV agreement and triggered MTV's obligation to produce and air an ad by selling $500,000 worth of Sunday Players

merchandise, there is no guarantee the ad would have led to blockbuster sales. The jury heard no evidence about what makes an ad successful, whether MTV was any good at producing ads, or what the Sunday Players ad would have looked like. Even assuming the ad was a good one, it would have had to have reached as many people as Under Armour's ad did. But the jury heard no evidence of the number of people who saw Under Armour's ad, how often it ran, or whether it ran on channels other than ESPN. Jackson testified that MTV had promised two million dollars' worth of free promotional time on its programming, but that promise was not part of the draft contract between Kellwood and MTV. Even assuming Jackson's estimate of the value of this airtime was correct, the jury was forced to speculate that MTV would have kept its oral promise to give it away for free. But even assuming that MTV gave Kellwood two million dollars of airtime, the jury heard no evidence of what sort of sales that kind of marketing could produce. In fact, the jury heard no evidence that product placements on MTV resulted in increased sales at all. Even assuming that the MTV product placements increased sales, the jury heard no evidence that MTV's free airtime would have been as valuable as the airtime Under Armour had on ESPN. Even assuming that MTV's airtime and ESPN's airtime were roughly comparable, the jury heard no evidence that MTV's audience would buy compression apparel at anywhere near the same rate as ESPN's. Even assuming that MTV's audience had the same appetite for compression apparel as ESPN's, the jury heard no evidence that the market would support a new brand when it was already dominated by Under Armour. In fact, the jury had good reason to doubt this last assumption because it heard evidence that established sports brands like Nike, Reebok, and Adidas were also trying to enter the market at the same time. Despite having famous names and millions of advertising dollars, those brands struggled to capture significant market share, and it is mere conjecture that Sunday Players would have proven more successful.

In short, Sunday Players's damages theory requires too many inferential leaps, too much guesswork, and too much selective blindness to support the lost profits verdict.

2.    **Whether Lost Profits Were Proven to a Reasonable Certainty**

Barnes, the plaintiffs' damages expert, testified that Kellwood would have sold $82,000,000 of Sunday Players product if it had performed on the contract. But Barnes had no expertise in marketing, and thus no basis for estimating what value, if any, reasonable marketing efforts would have yielded. As discussed above, the failure to account for the value that would have been added by Kellwood's full performance of the contract is fatal to Sunday Players's theory of damages. But even assuming that reasonable marketing efforts would have led to greater profits, Barnes's estimates were inadequate as a matter of law to support a damages award. Based on superficial similarities between the two companies, Barnes posited that Sunday Players, a new player in the compression market, would achieve half the sales of Under Armour, the market's dominating force. Barnes's testimony was little more than "speculation and conjecture," and it cannot justify an award of lost profits. Kenford, 67 N.Y.2d at 262.

Before analyzing the weaknesses in Barnes's testimony it bears noting that his expert report survived a challenge under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). The Court previously concluded:

> [E]xpert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable. Asserting that the success of Sunday Players might have paralleled that of Under Armour may very well be such a seemingly improbable conclusion. However, as Mr. Barnes does at least provide some explanation as to how he came to his conclusion and what methodologies substantiate that conclusion, we leave it to our adversary system to challenge reliable, albeit debatable expert testimony.

ECF No. 57 at 45-46 (internal quotation marks, citations, and alterations omitted). But testimony that is admissible under <u>Daubert</u> need not be sufficient to sustain a verdict. "The 'admissibility' and 'sufficiency' of scientific evidence necessitate different inquiries and involve different stakes," and, though <u>Daubert</u> loosened the standard for the *admissibility* of scientific evidence, "<u>Daubert</u> did not alter the standards for judgment as a matter of law in scientific cases" because it "left the traditional sufficiency standard intact." <u>In re Joint Eastern & Southern District Asbestos Litig.</u>, 52 F.3d 1124, 1131-32 (2d Cir. 1995) (emphasis omitted). Thus, "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment . . . ." <u>Daubert</u>, 509 U.S. at 596. Barnes's testimony was admissible, but it was not sufficient to prove lost profits.

Barnes claims to have chosen Under Armour as a yardstick because Sunday Players had "similar products," "similar manufacturing capability, similar retail distribution capability, similar business strategies," and similar "overall philosophy." Tr. at 1069. He also thought it was significant that Under Armour's founder and the Sunday Players management team were all former college football players. <u>Id.</u> According to Barnes, both Under Armour and Sunday Players were poised to have a "breakout year" in 2003. <u>Id.</u> at 1071. In 2003, Under Armour first got its "channel of distribution into the major sports retailers" and "entered into a broader marketing agreement with ESPN, and 2003 was also the year that Sunday Players entered into the license agreement with Kellwood." <u>Id.</u> at 1072. He contended that both Under Armour and Sunday Players intended to use grassroots marketing, television advertising, and athlete endorsements to sell their products. <u>Id.</u> at 1072-73. He believed that Kellwood had superior manufacturing capacity and relationships to retailers and could get its product to market more

efficiently than Under Armour could. Id. at 1072-75. Based on this analysis, Barnes concluded that Sunday Players would sell half as much product during the License Agreement's term as Under Armour did between 2002 and 2004. He reduced Under Armour's profit trend by 50 percent "so one can see Under Armour's dominance in the market, but also take into account competition from Nike, Reebok, and Adidas that were just now entering the market at that point." Id. at 1088-89.

New York law allows the jury to infer lost profits from the historical experience of a comparator *only* when "plaintiff's business bears a close comparison to the proposed business, the products or services involved are standardized, and the profits do not depend heavily on local or personal management skills." Schonfeld, 218 F.3d at 174 (quoting 3 Dobbs Law of Remedies at § 13.4(3)) (internal quotation marks omitted). Scrutiny of Barnes's testimony establishes that Under Armour was not an adequate comparator for Sunday Players. Instead, Barnes's comparison relied on a "seemingly endless list of assumptions" and, as a matter of law, "could establish neither the existence nor the amount of lost profits with reasonable certainty." Id. at 173.

For example, Barnes's assertion that Sunday Players, like Under Amour, would have had a "breakout year" in 2003 is demonstrably false. In 2003, Under Armour launched a major advertising contract, started marketing on ESPN, and entered into major agreements with sports retailers. By contrast, Sunday Players spent 2003 negotiating the License Agreement. It was not signed until November 2003, and, at that point, no marketing deals were in place, the MTV agreement was still being negotiated, and Sunday Players had no presence in major retailers. Barnes purported to account for those facts by estimating that Sunday Players would not earn

any profits until March 2005. But that adjustment only proves that, even under Barnes's analysis, 2003 *would not* have been a breakout year for Sunday Players.

Barnes thought that the two companies were comparable because they both sought to use grassroots consumer marketing, television advertisements, and athlete endorsements to sell their products. But Barnes is not a marketing expert, and this supposed similarity is pitched at such a high level of generality as to be totally meaningless. A company with ambitions to sell sporting apparel nationwide is apt to combine grassroots marketing, television advertising, and endorsements. In fact, the jury heard evidence that Nike, Adidas, and Reebok also pursued these well-established marketing approaches. Nor should it come as a surprise that Sunday Players shared Under Armour's marketing plan. Plumlee, Sunday Players's head of sales, sought to copy that plan because Under Armour had been so successful. But adopting the same strategy as the dominant competitor does not make a new business into a juggernaut.

Barnes testified that Kellwood had superior manufacturing capacity and longstanding relationships with retailers that made it better in some ways than Under Armour. The evidence at trial, however, showed that Kellwood had difficulties getting meetings with retailers to sell Sunday Players. Under Armour, which by 2003 already dominated the compression apparel market, had a significant head start on Sunday Players. The jury heard evidence that Under Armour had been building its business since 1996 by placing its products in movies, signing a 1999 licensing agreement in Japan, and receiving endorsements from approximately 40 professional athletes. But even assuming that Kellwood's size, manufacturing capacity, and retail presence could compete against Under Armour's market dominance, those advantages would not differentiate Sunday Players from other competitors, such as Nike, Reebok, and Adidas, that were also seeking market share. For example, the jury heard evidence that it took Nike from

2003 to 2005 and $30 million in advertising to get from three and a half percent of the compression market to five or six percent. Barnes argued that Nike, Reebok, and Adidas are inapt comparisons because they used their resources to sell shoes as well as compression apparel. But Kellwood's primary business was private label, not sports apparel, and neither Barnes's testimony nor any evidence at trial can explain how a company that primarily makes branded clothing for other companies was in a better position than three well-established sporting goods companies to market sports apparel.

To account for these weaknesses, Barnes hedged his analysis. He reduced Under Armour's profit trend by 50 percent "so one can see Under Armour's dominance in the market, but also take into account competition from Nike, Reebok, and Adidas that were just now entering the market at that point." Id. at 1088-89. But this reduction was little more than an admission that Sunday Players was not like Under Armour. The law requires a yardstick business to bear a "close comparison" to the plaintiffs', and Barnes's own testimony showed that Sunday Players and Under Armour were not closely comparable. Schonfeld, 218 F.3d at 174. Notably, unlike Sunday Players, Under Armour did not have to compete against *itself* for market share.

Sunday Players argues that New York's "wrongdoer rule" should save its lost profits verdict. Under that doctrine, "when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages." Contemporary Mission, 557 F.2d at 926. But the rule does not apply here "for the simple reason that the *existence* of lost profit damages cannot be established with the requisite certainty." Schonfeld, 218 F.3d at 174.

Contemporary Mission illustrates this point. In Contemporary Mission, the "wrongdoer rule" permitted the plaintiff to introduce yardstick evidence showing probable sales of recordings

of the rock opera *Virgin*. <u>See</u> 557 F.2d at 926-28. But that evidence was admitted only because

<u>Contemporary Mission</u> was:

> not a case in which the plaintiff sought to prove hypothetical profits
> from the sale of a hypothetical record at a hypothetical price in a
> hypothetical market. At the time of the sale to ABC, the record was
> real, the price was fixed, the market was fixed, and the record's
> success, while modest, was increasing.

<u>Id.</u> at 927. In other words, the yardstick evidence was not itself the evidence of lost profits. Lost

profits had already been proven, and the yardstick established only how much they should be.

Here, by contrast, Sunday Players relies on the comparison to Under Armour to prove that its

product would have sold at all.

Put another way, a yardstick is "most useful as a rational measure" when "the plaintiff

can show his share of the total market before breach." 3 Dobbs Law of Remedies at § 12.4(3). In

<u>Bloor v. Falstaff Brewing Corp.</u>, Falstaff failed to market and promote Ballantine, the plaintiffs'

established beer brand, causing a precipitous drop in revenue. The Court of Appeals held that

"the most nearly accurate comparison was with the combined sales of Rheingold and Schaefer

beers, both, like Ballantine, being 'price' beers sold primarily in the northeast," and lost profits

could be "computed" based on "what Ballantine sales would have been if its brands had suffered

only the same decline as a composite of Rheingold and Schaeffer." <u>Bloor</u>, 601 F.2d 609, 615 (2d

Cir. 1979) (Friendly, J.). The yardstick comparison can show the profits a company could have

expected if it had maintained its market share; it cannot establish that a company without market

share would have become an overnight success.

Sunday Players had no market share, yet it asked the jury to accept the market leader as a

yardstick. This amounted to little more than "the entrepreneur's cheerful prognostications," and

it was not enough as a matter of law to support the lost profits verdict. Schonfeld, 218 F.3d at 173.

### 3.     Expectations of the Parties

Sunday Players argues that lost profits were within the "contemplation of the parties to the contract at the time it was made" and should be awarded as damages. Kenford, 67 N.Y.2d at 261. According to Sunday Players, Barnes's lost profits estimate was based on Under Armour's historical sales data that would have been available to the parties at the time of the contract. The parties intended to compete with Under Armour—and believed they had a credible chance to break into Under Armour's market share—and therefore the parties expected to achieve the high level of market success shown by Barnes's model.

As a category of damages, lost profits were surely within the "contemplation of the parties." Id. The very point of a licensing contract is "to bring profits and revenues into existence." Wood, 222 N.Y. at 92. But Sunday Players did not demonstrate that the *amount* of lost profits was within the contemplation of the parties at the time the contract was made. Again, Sunday Players's damages theory fails for uncertainty and must be set aside.

Ashland, the leading case on whether lost profits were within the contemplation of the parties, illustrates why Sunday Players's proof was insufficient. In that case, Ashland, a financial portfolio management firm, and Janien, an analyst, co-created Eta, a computerized investment model. Eta was an incremental improvement over a model Ashland already used. A dispute arose, and Ashland fired Janien. The contract had a termination provision entitling Janien to 15 percent of the revenues from all Ashland accounts using Eta between 1988 and 1992. Another provision of the contract estimated "the minimum sums expected to be under management by the Eta model" for those years. Ashland, 82 N.Y.2d at 400. The question was whether Janien was

entitled to 15 percent of those minimum expected revenues even though the actual revenue was

uncertain at the time of the lawsuit. The Court of Appeals ruled that he was, concluding:

> The amounts set forth were minimum reasonable levels of
> investment the parties determined Eta would earn after studying and
> discussing the prospects extensively. Thus, the issue of future
> earnings was not only contemplated but also fully debated and
> analyzed by sophisticated business professionals at the time of these
> extended contract negotiations, projections of the increments to be
> anticipated over the years were calculated and provisions made for
> Janien's share of the anticipated profits. Inasmuch as Janien was
> entitled to damages based upon the revenues derived from "any and
> all existing or future" accounts, plaintiff must have foreseen that if
> it breached the contract defendant would be entitled to lost profits.

Id. at 405. In short, Janien showed that his damages were within the contemplation of the parties

by proving that the parties *actually contemplated* the lost profits that he sought.

Sunday Players made no such showing. No testimony established that Sunday Players,

Kellwood, or any other individual projected Sunday Players's revenue as one half of Under

Armour's. No testimony even established that the parties discussed Under Armour's revenue

figures during the contract negotiation. And no testimony supported a conclusion that the parties

had made any estimate at all of the expected revenue from their new venture. By contrast, the

parties in Ashland "explicitly projected the dollar amounts they anticipated to be invested in the

enterprise." Id. The law requires lost profits to be within the contemplation of the parties at the

time of the contract based on their explicit understanding of the likely success of the enterprise.

It does not permit Sunday Players to recover lost profits based on its ambitious hopes for wild

success.

### C.    Lost Value

Finally, in directing judgment as a matter of law, the Court cannot simply substitute the

jury's lost value damages verdict for the lost profits verdict because the lost value verdict is also

erroneous as a matter of law. Sunday Players proved that Kellwood's breaches caused it to lose business value, but the only evidence of lost business value came from Barnes's unreliable lost profits estimates. Accordingly, the lost profits verdict is the product of "sheer surmise and conjecture" and must discarded. <u>Bucalo</u>, 691 F.3d at 127-28.

When a contract breach has caused a business to lose market value, "the most accurate and immediate measure of damages is the market value of the asset at the time of breach—not the lost profits that the asset could have produced in the future." <u>Schonfeld</u>, 218 F.3d at 176. That is because determining lost market value requires less speculation than determining hypothetical profits. Market value damages "are based on future profits as estimated by potential buyers who form the market and reflect the buyer's discount for the fact that the profits would be postponed and uncertain." <u>Id.</u> (quoting 1 Dobbs Law of Remedies § 3.3(7)) (internal quotation marks and alterations omitted). A court need not guess what would have happened in some alternate world where the contract was performed. Instead, a court looks to actual, historical evidence of the market's assessment of what the future held for the venture. In short, a court looks to the value of the asset "at the time of the breach," and freezes damages at that moment in time. <u>Sharma v. Skaarup Ship Mgmt. Corp.</u>, 916 F.2d 820, 825 (2d Cir. 1990).

At trial, the plaintiffs proved that Sunday Players had value before the breach. Evidence showed that it had been selling products even before entering the License Agreement, and it had plans to expand. The plaintiffs and defendant agreed that Sunday Players's compression fabric was as good as or better than other fabric on the market. The jury could infer from Reese's testimony that football players were excited about Sunday Players's product line, and both Kellwood and MTV were interested enough in the brand to draw up marketing agreements.

The evidence also showed that Kellwood's breaches "destroyed" Sunday Players. Tr. at 227. Kellwood failed to get Sunday Players into stores, and Sunday Players had no retail toehold when Kellwood terminated the License Agreement. Kellwood's early termination also deprived Sunday Players of its manufacturing and marketing resources. The jury could conclude that Kellwood crippled Sunday Players before it even had a chance to compete in the national marketplace.

The jury's lost value verdict, however, was based on "sheer surmise and conjecture," and the Court will order a new trial on damages. Bucalo, 691 F.3d at 127-28. The jury's lost value award, $500,000, was plainly based on Barnes's lost value estimate of $532,500—no other estimate of Sunday Players's March 2005 value was presented at trial. Barnes based his value estimate on the hypothetical trailing 12 months of profits Sunday Players would have earned before March 2005 but for Kellwood's breaches. But, as discussed at length above, Barnes's estimate of lost profits was entirely speculative. Because his lost value estimate relied on his faulty lost profits estimate, Barnes's testimony did not provide a stable foundation for the jury's verdict.

### D.    New Damages Trial

The plaintiffs proved that Kellwood breached the contract by terminating early, failing to provide free promotional samples, and failing to use reasonable efforts to market and promote Sunday Players. They also proved that Kellwood's breaches caused Sunday Players to lose business value. But they did not prove that Kellwood's breaches caused lost profits, and the jury's lost value verdict was erroneous as a matter of law. In this circumstance, the Court would be within its discretion to enter judgment as a matter of law awarding the plaintiffs nominal

damages. See T & N PLC v. Fred S. James & Co. of N.Y., 29 F.3d 57, 60 (2d Cir. 1994) (Under New York law, "nominal damages are always available for breach of contract.").

The Court, however, also has the discretion to order a new trial. Under Rule 50(b), the Court may enter judgment as a matter of law *or* order a new trial. "This 'either-or' language means what it seems to mean, namely that there are circumstances which might lead the trial court to believe that a new trial rather than a final determination of the trial stage of the controversy would better serve the ends of justice." Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 215 (1947).

Barnes's unfounded speculation led the jury astray, but Sunday Players showed that Kellwood's breaches caused it harm. The Court finds that it is in the interests of justice to provide Sunday Players with a second opportunity to marshal the evidence to prove damages. Accordingly, the Court shall order a new trial with respect to damages only. At the new damages trial, Sunday Players will be precluded from introducing Barnes's testimony under Federal Rule of Evidence 403 because it presents a danger of "unfair prejudice" and "misleading the jury." The Court will also instruct the jury on nominal damages in the event that Sunday Players cannot muster sufficient evidence of loss.

## III.    Conditional Rulings Under Rule 50(c)(1)

Under Federal Rule of Civil Procedure 50(c)(1), if the court grants a motion for judgment as a matter of law "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). The Court has already decided that a new damages trial will be necessary, but, out of an abundance of caution, the Court will rule conditionally on the parties' motions for a new trial.

### A.     Kellwood's Motion

Kellwood's Rule 59 motion for a new trial is conditionally granted in part. If this Order were to be vacated because the parties are not entitled to a damages new trial under Rule 50, then the Court would award a new damages trial under the less exacting standard of Rule 59.

#### 1.     Damages

As discussed at length above, Sunday Players did not present sufficient evidence proving lost profits. The Court "is convinced that the verdict was manifestly erroneous" with respect to lost profit damages, and, even if judgment as a matter of law is inappropriate, a new damages trial should be held. Manley, 337 F.3d at 246. Moreover, even assuming that the Court of Appeals later finds that Barnes's testimony was sufficient to prove lost profits to a reasonable certainty, the jury erred by exceeding his estimate. The jury awarded $4,100,000 in lost profits between March 14, 2005, and January 31, 2007, but Barnes's estimate was $3,570,000. No evidence in the record supports the jury's higher figure to a reasonable certainty.

#### 2.     Jury Instructions

Kellwood argues that the liability verdict was erroneous because the Court denied its request for certain jury instructions. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994). An error in the jury instructions requires a new trial only if the instructions, "read as a whole" did not present "the issues to the jury in a fair and evenhanded manner." Lore v. City of Syracuse, 670 F.3d 127, 156 (2d Cir. 2012).

##### a.     Lack of Track Record

Kellwood argues that the Court erred by failing to instruct the jury with respect to the added scrutiny that should be given to new businesses seeking lost profits. The Court concluded

that such an instruction would not assist the jury in its deliberations because the application of appropriate scrutiny to lost profits claims by new businesses is a legal assessment, not a factual one. For the jury, "the test remains the same, i.e., whether future profits can be calculated with reasonable certainty." Ashland, 82 N.Y.2d at 404. The Court's instructions adequately informed the jury of the law, and the lack of a new business instruction was not erroneous. Kellwood has cited no case requiring a trial court to give a new business jury instruction. Kellwood was free to argue to the jury, as it did, that Sunday Players's lack of a track record undermined any claim of lost profits.

### b.    Nominal Damages

Kellwood argues that the Court erred by failing to instruct the jury on nominal damages. The Court agrees, but concludes that any error was harmless.

Under New York law, "nominal damages are always available for breach of contract." T & N PLC, 29 F.3d at 60. Even in cases where a plaintiff's allegations of substantial damages are too speculative, the plaintiff "would have plausible claims for nominal damages." Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie, 784 F.3d 78, 87 (2d Cir. 2015).

Having heard the evidence available to the plaintiffs, the Court has reconsidered its prior ruling denying Kellwood's request for a nominal damages charge. The trial evidence of damages consisted almost entirely of Barnes's speculative valuation testimony. Had the jury set this testimony aside, Sunday Players still would have had a plausible case for nominal damages. By failing to give a nominal damages instruction, the Court did not "adequately inform the jury on the law." Perry, 115 F.3d at 153. The Court's error, however, was harmless. The jury ultimately awarded Sunday Players $4,350,000 in lost profits—$567,000 *more* than Barnes had testified it

had lost. This was not a jury that felt constrained to award a verdict in line with Barnes's estimate. Nor was it a jury that was looking for a way to vindicate the plaintiffs' rights without also giving them a substantial damages award. In short, a nominal damages instruction would not have changed the trial's outcome.

### c.        Sunday Players's Obligations Under Section 9.3

Kellwood argues that the Court erred by failing to instruct the jury to consider whether Sunday Players fulfilled Section 9.3 of the License Agreement by obtaining athlete endorsements. Section 9.3 reads:

> Licensee shall provide Licensor an inventory of samples, not to exceed a total cost of $25,000 wholesale per Royalty Year, to be used as giveaways (specifically to give away to the individuals who endorse the Licensed Products), special events, trade shows and to be displayed in a showroom.

ECF No. 191-12 at 7.

The Court ruled on the record that the License Agreement *did not* obligate Sunday Players to sign athletes to endorsement deals and instructed the jury that Sunday Players had complied with its obligations under the contract. The Court concludes that its prior rulings were not erroneous and will not award a new trial on this basis.

### d.        Kellwood's Obligations Under Section 9.1

Second, Kellwood argues that the Court should have instructed the jury to consider whether Section 9.1, which obligated Kellwood to spend three percent of sales on marketing, limited Kellwood's obligation to market and promote Sunday Players, and, if so, whether and to what extent it affected Kellwood's obligation to use reasonable efforts before March 2005. The Court reiterates its conclusion, discussed at length above, that Section 9.1 could not limit

Kellwood's obligation to use reasonable efforts as a matter of law. The Court concludes that this ruling was not erroneous and will not award a new trial on this basis.

### e.        Notice of Breach

Kellwood argues that the Court should have instructed the jury to consider whether Section 12.1 of the License Agreement required Sunday Players to provide notice of Kellwood's breach. On summary judgment, the Court concluded:

> It is a matter of common sense and fairness that a party to contract—perhaps fearing that the other party may soon provide notice of breach—may not simply terminate that agreement early and therefore entirely cut off the non-breaching party's ability to seek damages for pre-termination misbehavior.

ECF No. 92 at 62. The Court concludes that this ruling was not erroneous and that an instruction regarding the contract's notice provision would not have been appropriate. In any event, the absence of such an instruction was harmless. Sunday Players's principals presented sufficient evidence of their growing displeasure with Kellwood's pre-termination performance, and a rational jury could have concluded that they would have provided notice but for Kellwood's unlawful early termination.

### 3.        Summation Misconduct

Kellwood argues that Sunday Players's counsel committed misconduct during summation by improperly calling Plumlee an "expert"; suggesting, without evidence in the record, that Kellwood's performance apparel division was unprofitable; and commenting on the recency of defense counsel's arrival to the case. But, as Kellwood concedes, the Court sustained Kellwood's objections to these peccadilloes and gave the jury a lengthy curative instruction. Generally, "it must be presumed that juries are able to understand the court's instructions, and that juries follow these instructions." Okraynets v. Metro. Transp. Auth., 555 F. Supp. 2d 420, 426 (S.D.N.Y.

2008). Nothing indicates that the jury did not understand the Court's curative instruction, and nothing leads the Court to believe that the jury's liability verdict hinged upon any improper summation.

### 4.	Evidentiary Rulings

Kellwood argues that a new trial is warranted because of three evidentiary rulings that it believes were erroneous. A new trial may be warranted if the court's erroneous evidentiary rulings caused the jury to reach "a seriously erroneous result" or the verdict "is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks omitted). "A new trial may be warranted if substantial errors were made in admitting or excluding evidence." Stampf v. Long Island R. Co., 761 F.3d 192, 202 (2d Cir. 2014) (internal quotation marks omitted). The Court will not grant a new trial on the basis of its evidentiary rulings.

Kellwood argues that Plumlee should have been precluded from giving testimony about what constitutes reasonable marketing efforts. According to Kellwood, Plumlee gave expert testimony in violation of Federal Rules of Evidence 701 and 702. The Court disagrees. Plumlee's testimony was sharply limited to describing Sunday Players's preferred marketing strategy—a strategy that he personally developed in large part based on his prior experience in marketing and by studying Under Armour's successful marketing campaign. In other words, Plumlee testified from personal experience about facts relevant to this case—what marketing strategy Sunday Players adopted and how the company developed that strategy. Plumlee did not testify about industry norms or give any testimony about why certain brand strategies work and others do not—the type of information beyond the ken of the average juror. Kellwood argues that Plumlee gave expert opinion testimony when he described Kellwood's marketing efforts as an "abject

failure," but that description, too, is opinion testimony that was within the ken of the average juror. Kellwood failed to sell a single unit of Sunday Players merchandise; its marketing strategy *was* a failure.

Kellwood argues that the Court impermissibly excluded evidence concerning the profitability of the performance apparel division. The Court ruled on the record that this evidence was not relevant because it could only serve as an explanation of why Kellwood terminated the contract early—and the Court had previously held that Kellwood was not justified in doing so. The Court will not revisit this evidentiary ruling and concludes that any error would have been harmless.

Kellwood also argues that the Court impermissibly excluded video evidence of the Under Armour commercial on the grounds that it was more prejudicial than probative. The Court sees no reason to revisit this ruling. The commercial, approximately 30 seconds of bombast, served virtually no probative purpose. The jury could not conclude, from the commercial alone, how successful Under Armour's marketing campaign had been. Nor did the commercial prove anything about what Kellwood's reasonable marketing efforts should have entailed. The Court did not err in excluding the video.

### B.     Sunday Players's Motion

Sunday Players moves for a new trial arguing that the Court improperly excluded expert testimony, the lost damages verdict was against the weight of the evidence, and the jury should have been allowed to decide whether Kellwood would have renewed the License Agreement but for its breaches. The motion is denied.

### 1.      Barnes's Lost Market Value Testimony

In his expert report, Barnes estimated lost market value "based on the estimated royalty stream expected during the initial term of the License Agreement and projecting that royalty stream forward as of the valuation date of January 31, 2007," the end of the Agreement's initial term. ECF No. 204-6 at 34. "For the purposes of estimating the future royalty case flow stream to [Sunday Players] as of January 31, 2007," Barnes used "the last twelve month trailing royalty stream calculated as of January 31, 2007." Id. at 36. Using that figure as a basis, he estimated a perpetual future income stream with a 10% growth rate and a 50% discount rate. Under the yardstick approach, he concluded that the "estimated lost value of the Sunday Player[s] brand as of January 31, 2007 is $6.13 million." Id. at 37 n.41.

During the pretrial conference, the Court told the parties that it would instruct the jury to calculate lost value damages as of the moment of breach, March 14, 2005. The Court said:

> New York law is very clear that you look at the moment of breach, which here is 2005. I know that Mr. Barnes has submitted his reports that look to blocks of time going from signature date through the expiration of the contract. I'm not sure why that was done. I don't think it's consistent with New York law.

ECF No. 159 at 5.

Based on the Court's ruling, Barnes recalculated the brand value as of March 31, 2005, as $5,082,000. See ECF No. 200-6. According to Barnes, he "used the same 12 months trailing royalty or lost profit income under the original term of the exclusive license agreement to calculate that lost value, but discounting it at a different period of time in March 2005." Tr. at 1105.[1] Kellwood objected that this method of valuing Sunday Players was inconsistent with the

---

[1] This method is by no means reflected by Barnes's revised damages chart. See ECF No. 200-6. There, Barnes appears to have calculated a monthly stream of royalty income from April 1, 2005 to January 31, 2007, discounted each monthly amount to March 31, 2005, using an undisclosed discount rate, and then *added* the sum of those discounted amounts, $2,166,000, to a figure labeled "Estimated Terminal Value of Lost Value of Brand as of March

method Barnes used in his expert report and moved to preclude Barnes from introducing the new value estimate at trial. Following a hearing on the issue, the Court agreed, and instructed Barnes to recalculate market value using the last trailing 12 months of income as of March 2005. Using that method, Barnes calculated lost value as $532,000.

Sunday Players argues that Barnes should have been allowed to testify to his original recalculation of lost brand value. According to Sunday Players, the Court should have accepted Barnes's assertion that he used the same methodology as he had used in his expert report. The Court disagrees.

Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert witness to provide a written report setting forth the expert's methods and conclusions. Experts can update their conclusions after discovery, but their updated conclusions must be consistent with the methods used in the expert report. Expert testimony "exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)." In re Kreta Shipping, S.A., 181 F.R.D. 273, 275 (S.D.N.Y. 1998). Courts "will not admit supplemental expert evidence following the close of discovery when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report, as doing so would eviscerate the purpose of the expert disclosure rules." Cedar Pharm., Inc. v. Dongbu Hannong Chem. Co., Ltd., 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (internal quotation marks and alterations omitted).

In the expert report, Barnes used a capitalization approach to estimate market value. He took the sum of the profits from the twelve months preceding the valuation date and then

---

31, 2005 date of Breach." Together, those figures totaled $5,082,000. The revised chart does not disclose the math used to arrive at the "Estimated Terminal Value" or why it was appropriate to add that figure to the discounted cumulative royalties.

capitalized them as a perpetuity. He applied a growth rate of 10% and a discount rate of 50%. To

determine the value as of January 2007, the math looked like this:

$2,453,000 (profits from January to December 2006) / (.5 - .1)
= $6,132,000

Applying this same method to determine the value as of March 2005, Barnes should have taken

the sum of the profits from the twelve months preceding that date and then capitalized that sum

using the same growth and discount rates. The math should have looked like this:

$213,000 (profits from March 2004 to February 2005) / (.5 - .1)
= $532,000

But, as Barnes testified, that is not how he reached his revised estimate. Instead, he capitalized

the sum of the profits from the twelve months preceding January 2007 and then discounted that

figure to March 2005. In short, he used "a wholly new and complex approach" designed to

maximize the amount of lost value the Sunday Players could claim. Cedar Pharm., 769 F. Supp.

2d at 279. The Court properly precluded Barnes from using it at trial.

Sunday Players counters that Barnes arrived at his first recalculation by using the same

method as he did in his expert report because both estimates relied on the profit stream that the

parties would have expected "as the benefit of the bargain"—i.e., the estimated profit stream

from November 2003 to January 2007. In other words, he took what Sunday Players thought that

it would have made had Kellwood performed the contract and then based his valuation on that

expectation, discounted to March 2005.

This approach does not accord with New York contract law. It is "fundamental" that

where a contract breach "involves the deprivation of an item with a determinable market value,

the market value at the time of the breach is the measure of damages." Sharma, 916 F.2d at 825.

Further, the future expectation of the *parties* is irrelevant to the calculation of market value; the

court looks instead to what the *market* was actually willing to pay at the time of breach. "A damages award should be based upon what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach." Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 391 (2d Cir. 2006).

While there are many ways to value a company, Barnes's original approach required an investor to take a historical profit stream and capitalize it into the future. In Barnes's hypothetical world where Kellwood did not breach its marketing obligation, Sunday Players would have earned only $213,000 at the time of breach. A hypothetical investor adopting Barnes's approach in March 2005 would have had only that hypothetical profit stream for analysis.

**2. The Weight of the Evidence Supporting the Lost Market Value Verdict**

Sunday Players argues that the jury's lost market value verdict was against the weight of the evidence because the jury learned that Kellwood bought the brand Phat Fashions for $140 million. Testimony indicated that Kellwood's CEO mentioned this sale during negotiations over the License Agreement. According to the plaintiffs, he told each of the Sunday Players principals that Phat Fashions "could be Sunday Players one day." Tr. at 551; see also id. at 1490, 218-19, 361. According to the plaintiffs, this testimony should have persuaded the jury that Sunday Players was worth more than $500,000.

Sunday Players has failed to persuade the Court that the jury's verdict was "manifestly erroneous" on this ground. Manley, 337 F.3d at 246. Even if the witnesses were telling the truth—and no documentary or other direct evidence either supports or refutes their account—the fact that Kellwood's CEO mentioned the purchase price of another brand has absolutely no relevance to Sunday Players's market value. Nothing in the record suggests that Phat Fashions was comparable to Sunday Players in any way. The record does not even establish what type of

clothing Phat Fashions sold, the type of customer who bought it, or Phat Fashions's market share. The record evidence established only that Phat Fashions was already well-established when Kellwood bought it. Sunday Players was, by contrast, an anonymous start-up. The CEO's comparison of the two brands was mere flattery, not an objective value comparison, and it provided no basis for concluding that Sunday Players was worth millions of dollars. Finally, Sunday Players advanced this damages theory for the first time in this motion, and the jury did not err by failing to consider it.

### 3.    The Renewal Period

Sunday Players asks for a new trial on the question of whether Kellwood would have renewed the License Agreement if it had not breached it. According to the plaintiffs, evidence at trial showed that Kellwood would have renewed the license agreement had Sunday Players been profitable. Given this evidence, the plaintiffs argue, the Court erred by excluding Barnes's proffered testimony regarding lost profits during the hypothetical renewal period. They also argue that the Court should have instructed the jury to consider whether Kellwood would have renewed the contract had it been profitable.

In essence, Sunday Players seeks lost profits damages from the renewal contract. This argument fails to persuade for the simple reason that there was no renewal contract. Kellwood did not renew. The plaintiffs cannot sue for damages on a contract that was never formed. See, e.g., Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) ("To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.").

Theoretically, the failure to renew could be a consequential injury caused by Kellwood's breaches of the License Agreement. But consequential damages "must be not merely speculative, possible, and imaginary," instead, "they must be reasonably certain and such only as actually follow or may follow from the breach of contract." Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209 (1886). To conclude that a party would have done precisely the opposite of what it actually did—in this case to renew a contract that it terminated early—is to engage in inherently speculative and imaginary thinking. Under basic principles of consequential damages, Sunday Players cannot show that the failure to renew flowed from Kellwood's breaches.

The Court has found scant support in the case law for the Sunday Players's damages theory. One exception is Koufakis v. Carvel. There, the plaintiff operated a Carvel franchise under a 10-year agreement that gave Carvel the unilateral right to renew. Carvel did not renew; it terminated the contract early. The evidence showed that Carvel franchises generally involved a long-term business commitment from Carvel. If the franchises were profitable, they were almost always renewed, and the plaintiff paid considerable start-up costs expecting to have a lifelong relationship with Carvel. His expectation was reasonable because it was borne out by the experience of other franchisees. Only after the court determined that "there was evidence in the record that renewal was reasonably likely under all the circumstances" did it instruct the jury to consider a renewal term in its damages calculation. Koufakis v. Carvel, 425 F.2d 892, 908 (2d Cir. 1970).

This case bears no similarity to Koufakis. No evidence showed that Kellwood had a uniform policy of renewing license agreements. Sunday Players presented some evidence that Kellwood had a general corporate strategy of developing brands, but that is a far cry from showing that Kellwood had a regular practice of renewing licenses with apparel start-ups. The

plaintiffs elicited testimony from Dorf that if Sunday Players had been profitable, Kellwood would have renewed the license. But Dorf did not say how profitable Sunday Players would have needed to be, and the jury was left to speculate that the brand would have met that mark. Further, unlike the franchisee in <u>Koufakis</u>, Washington did not pay any start-up costs in anticipation of a long business relationship. In fact, he testified that he was eager to *reduce* the length of the commitment. Under those circumstances, the expectation of an automatic renewal was not a reasonable one.

Finally, the evidence at trial showed that renewal would have been highly unlikely. Shortly after Kellwood terminated the License Agreement, it shut down the performance apparel division, closed the Honduran factory where it made compression wear, and laid off Dorf and Peterson. In short, it eliminated the means to perform a renewal contract. Unlike Carvel, which continued to franchise its brand after breaching its contract with Koufakis, Kellwood could not continue manufacturing or marketing Sunday Players apparel. No rational jury could conclude otherwise, and the Court properly withheld the question from consideration.

## CONCLUSION

For the foregoing reasons, Kellwood's motion for judgment as a matter of law is GRANTED in part, Kellwood's motion for a new trial is conditionally GRANTED in part, and the plaintiffs' motion for a new trial is DENIED. The Judgment is VACATED with respect to damages, and a new damages trial is ORDERED. The Clerk of Court is directed to terminate the motions docketed at ECF Nos. 190 and 193.

The parties are directed to engage in supervised mediation. By Friday, July 29, 2016, the parties shall submit a joint letter indicating whether they prefer referral to a federal magistrate judge, court-appointed mediation, or private mediation. A joint proposed final pretrial order and

all pretrial motions including any motions in limine are due on August 15, 2016. The joint proposed pretrial order should be prepared in accordance with the Court's November 16, 2015 Trial Scheduling Order. Any oppositions are due August 22, 2016. A pretrial conference is scheduled for Wednesday, September 7, 2016, at 10:00 a.m. in Courtroom 219, Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. Trial is scheduled to begin Tuesday, September 13, 2016, at 9:00 a.m. Trial is expected to last no more than three days.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            July 15, 2016