UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DARYL K. WASHINGTON, et al.,

                           Plaintiffs,

          -against-

KELLWOOD COMPANY,

                           Defendant.

-----------------------------------------------------------------X

05-CV-10034 (SN)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/2016

**SARAH NETBURN, United States Magistrate Judge:**

      The only question remaining in this breach of contract case is whether the Court should allow a retrial on damages to proceed despite a lack of non-speculative evidence.

      A court "should not grant a new trial" simply because "the losing party believes it can present a better case if afforded another chance." Libutti v. United States, 178 F.3d 114, 118-19 (2d Cir. 1999). The plaintiffs' motion for reconsideration seeks to retry their case with entirely new evidence. The linchpin of their motion is a pair of documents that the plaintiffs have never before sought to use in this litigation. The plaintiffs' expert did not rely on these documents. They were not part of the summary judgment briefing. They were not introduced at the first trial. And they were not on the extensive trial exhibit list for the second trial. The Court will not proceed with a retrial because the plaintiffs think they can present a better case with this evidence. Litigation is not an iterative process. Accordingly, the motion for reconsideration is denied, and the Court will enter judgment as a matter of law in the amount of one dollar.

## OVERVIEW

This order assumes familiarity with the Court's prior decisions. At trial, the plaintiffs (collectively, "Sunday Players") failed to prove their theory of damages as a matter of law. Their expert testified that Sunday Players, a start-up apparel company, would have sold half the volume of the market leader Under Armour within a matter of years. The Court ruled that this testimony was "sheer surmise and conjecture" and vacated a jury award of $4,350,000 in lost profits. ECF No. 212 at 28-29 (Order on Motion for Judgment as a Matter of Law ("JMOL Order")). The Court ordered a retrial limited to lost value damages.

Given a second opportunity to prove their case, Sunday Players made clear that they had no intention of pursuing a realistic damages award. In the proposed Joint Pretrial Order, the plaintiffs *increased* their estimated damages from the $4.35 million that the Court set aside as too speculative to a range of $5 to $140 million. The Court scrutinized their proffered evidence and concluded that they could not prove that they lost millions of dollars in value. They could not rely on a prior income history because the fledgling brand sold less than $200,000 over its entire lifespan. They could not rely on expert testimony because their expert's opinion was based on "sheer surmise and conjecture." ECF No. 249 at 7. They could not rely on evidence of sales of comparable businesses because their two proposed comparators—Phat Fashions and Under Armour—were not comparable. They could not rely on the testimony of Sunday Players's owners because their personal knowledge and experience could not rationally support multimillion dollar value estimates. They could offer no evidence of prior offers because the trial evidence showed that there had been none. And their lay testimony regarding the effectiveness of sales and marketing efforts lacked the specifics required to prove their case.

The Court's ruling on the *in limine* motions left the plaintiffs with virtually no admissible evidence to establish lost business value. Accordingly, to conserve judicial resources, the Court adjourned the trial and directed the parties to appear for oral argument on why the Court should not reconsider its JMOL Order and enter judgment as a matter of law for nominal damages.

Sunday Players moved for reconsideration, arguing that the Court should allow them to introduce two heretofore unseen profit projections as proof of its value. To be clear, Sunday Players did *not* introduce these profit projections at the first trial. It did *not* include them on its list of nearly 200 proposed trial exhibits for the second trial. It did *not* question any deposition witness about them, including Kellwood's Rule 30(b)(6) witness. And its damages expert did *not* rely on them. The reason seems clear. Kellwood's draft budget shows Sunday Players making only $1.35 million during the period 2004-2006, but Sunday Players has consistently sought much more. Serious questions about both documents' admissibility also abound. The provenance of Kellwood's document is not clear from its face, and Sunday Players has not shown that it can establish a foundation for introducing it into evidence. Sunday Players's own estimate, made sometime in 2002 or 2003, reflects nothing more than the owners' optimistic projections that were undermined by subsequent events (namely, Sunday Players's failure to attract investment capital and sell hundreds of thousands of dollars' worth of merchandise in 2003 and Kellwood's failure to sell a single product over 17 months).

Sunday Players also asks the Court to reconsider the exclusion of its owners' lay value estimates. It argues that the Court failed to appreciate its owners' qualifications, experience, and market research. But the Court has already considered and rejected the plaintiffs' arguments and sees no basis for revisiting its prior decision.

## I. Standard of Review

"Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3 govern motions for reconsideration, and these rules are intended to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a losing motion" with additional facts and arguments. TufAmerica, Inc. v. Diamond, 12-cv-3529 (AJN), 2016 WL 3866578, at *1 (S.D.N.Y. July 12, 2016) (internal quotation marks omitted). A reconsideration motion is not "a vehicle for a party dissatisfied with the Court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion, nor to secure a rehearing on the merits with regard to issues already decided." Parrish v. Sollecito, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003). Instead a "motion for reconsideration should be granted only when the defendant identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Kolel Beth Yechiel of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F.3d 99, 104 (2d Cir. 2013) (internal quotation marks omitted).

The Court, in its discretion, can exclude evidence from a retrial that was not offered during the first trial. See Habecker v. Clark Equip. Corp., 36 F.3d 278, 287-89 (3d Cir. 1994); Total Containment, Inc. v. Dayco Prods., Inc., 177 F. Supp. 2d 332, 338-39 (E.D. Pa. 2001); Whitehead v. K Mart Corp., 173 F. Supp. 2d 553, 564-56 (S.D. Miss. 2000). The touchstone is whether excluding the evidence advances fairness to the parties and judicial economy. Rochez Bros. v. Rhoades, 527 F.2d 891, 894 n.6 (3d Cir. 1975); see also 11 Wright & Miller, Federal Practice & Procedure § 2803 ("Decisions respecting the admission of additional witnesses and proof should be guided by considerations of fairness and justice to all parties.").

## II.  The Proffered Evidence

### A.  Kellwood's Purported Profit Projections

Sunday Players argues that Kellwood's purported revenue projections should be introduced at the new trial. See ECF Nos. 257-4, 263-2. Sunday Players did not include this document in its pretrial list of nearly 200 trial exhibits and has never offered it before to support its theory of the case. Had the Court allowed the second trial to go forward, it would not have been part of the evidence. Proffering it now is a transparent effort to plug the evidentiary gap identified by the Court. But a motion for reconsideration does not allow a party to use stale evidence to make new arguments. Kellwood produced the purported revenue projections with its 2010 document production. It is not "new evidence" for the purposes of a motion to reconsider because it was available at the time of the prior order. Kolel Beth Yechiel Mechil of Tartikov, 729 F.3d at 104. And it is not evidence that the Court overlooked because it was not proffered until this motion. The Court will not allow Sunday Players to use this motion to revise its trial exhibit list to include this document.

Further, Sunday Players forfeited its opportunity to rely on this document by failing to introduce it at the first trial. "Forfeiture is not a mere technicality and is essential to the orderly administration of justice." Freytag v. Comm'r Internal Rev., 501 U.S. 868, 894-95 (1991) (internal quotation marks omitted). Here, the plaintiffs could have attempted to introduce Kellwood's projection to prove that lost profits were "within the contemplation of the parties to the contract at the time it was made." Kenford Co. v. Cnty. of Erie, 67 N.Y.2d 257, 261 (1986). But Sunday Players chose not to use this document, relying instead on its damages expert. Offered a *second* damages trial, Sunday Players still held it in reserve. The plaintiffs are not

entitled to come up with yet a third way to prove their case after the Court has twice rejected their damages theory.

Finally, the purported revenue projection does not appear to be admissible. Sunday Players simply cannot establish any foundation for it. Sunday Players's owner, plaintiff Daryl K. Washington, testified in his deposition that he had never seen any projection prepared by Kellwood; he cannot introduce the document. See ECF No. 272-8 at 3 (Washington Dep. 171:24-172:23). Kellwood's witnesses Rick Peterson and Greg Dorf each denied making any projections of Sunday Players's sales. See ECF Nos. 272-4 at 3-4 (Peterson Dep. 180:5-182:14), 272-5 at 3-4 (Dorf Dep. 155:5-158:9), 272-6 at 3-4 (Trial Tr. 624:15-625:12 (Dorf's testimony), 272-7 at 3-4 (Trial Tr. at 968:4-19, 985:15-19 (Dorf's testimony)). There is no evidence of who created this document, how, or even when it was made. The document hardly speaks for itself and is not admissible without foundation testimony that Sunday Players does not have.

In short, the Court concludes that excluding this evidence from retrial will not result in unfairness to the plaintiffs because they had the opportunity to offer this evidence earlier in the proceedings and to establish a foundation for it. They declined to do so. In the interests of judicial economy, the Court will preclude the plaintiffs from propounding yet another new theory for damages based on this document.

  **B.**  **Sunday Players's Business Plan**

Sunday Players also proposes to proffer for the first time profit projections from a business plan that its principals made sometime between 2002 and 2003. (They cannot say when.) The plaintiffs' expert did not consider this document, it was not offered into evidence at summary judgment or the first trial, and it did not appear on Sunday Players's lengthy list of exhibits for the proposed retrial. For the same reasons that Sunday Players cannot introduce the

newly proffered Kellwood projections, it also cannot rely on this document. It is not "new evidence" because it was available to the plaintiffs at the time of trial, and the plaintiffs have forfeited this document to prove their damages theory.

The document also has fundamental evidentiary flaws and would be precluded under Federal Rule of Evidence 403 because it would mislead the jury. Quite simply, it has limited relevance in determining Sunday Players's value on the date of breach.

The measure of lost value is what an informed, willing buyer would have paid for the business at the date of breach, in this case March 2005. See Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000). But the document hails from 2003 (or 2002), two (or three) years before the breach. A willing buyer would not rely on information that is this old when valuing Sunday Players—especially when intervening events made the company's projections obsolete. For example, the document assumes that Sunday Players would have earned $517,380 in revenue during 2003, see ECF No. 263-1 at 7, but the company's actual revenues were closer to $43,000, see ECF No. 272-13 at 2 (Defendant's Tr. Exhibit KK). It also assumes that Sunday Players would have attracted $1,500,000 in initial capital, see ECF No. 263-1 at 7-8, but the company never received any significant investment.

The plan is nothing more than "the entrepreneur's cheerful prognostications," which are not enough to prove lost profits or lost value. Schonfeld, 218 F.3d at 173 (internal quotation marks omitted). The budget shows a growth rate of 525% percent in revenue between 2003 and 2004, 170% percent between 2004 and 2005, and 140% between 2005 and 2006. Even if historical events had not undermined these projections—Sunday Players made hardly any sales during this period—a reasonable buyer would have doubted Sunday Players's aggressive optimism. The revenue projections are not based on fundamentals, such as a historic growth rate

of sales or an appropriate comparator, but on a speculative assumption that Sunday Players would sextuple its revenue in the space of a year and more than double it for two years thereafter. There is simply no basis for that assumption. This business plan might be good marketing, but it is not something that a bona fide buyer would rely upon when valuing the company. Accordingly, it would be excluded under Rule 403.

### C.     MTV's Purported Projections

The plaintiffs seek to introduce MTV's projections that Sunday Players would capture 10-15% of the compression apparel market. The Court has consistently found this evidence to be unreliable and inadmissible for its truth. It is based on the hearsay testimony of Angela Jackson, who did not perform the purported projections and cannot speak on behalf of MTV. Sunday Players has never produced any documents showing MTV's projection at any stage of this litigation—including this motion. In the Daubert opinion, the Court found Jackson's testimony on market share research to be unreliable. See ECF No. 57 at 62 ("This statement by Ms. Jackson may well corroborate plaintiffs' assertion that some projection was done. It does not, however, represent what that projection may have been. Instead . . . this is nothing but the entrepreneur's cheerful prognostications . . . ." (internal quotation marks omitted)). At the first trial, the Court excluded testimony regarding specific market share projections because it was hearsay. See ECF No. 159 at 43 (Pretrial Conf. Tr. 43:3-8) ("There is no report to put in. There is no business record here. I'm also not going to allow [Jackson] to opine, as I don't think she is capable of doing, about what the percentages were or anything about this survey. As I understand it, there is no foundation."), 44 (Pretrial Conf. Tr. 44:5-16) ("[W]e don't have the survey. There is no basis for admitting it for its truth as a business record because we don't have the survey. She can testify about what she heard . . . . She can testify about that because it is relevant and goes to her

state of mind . . . . But the actual survey and details of it, there is just no foundation."). At trial, Jackson gave limited testimony about MTV's consumer research, but the Court instructed the jury not to consider it for its truth. See Trial Tr. at 494.

The Court sees no reason to revisit these rulings. Even if Jackson's testimony can establish that MTV conducted consumer research and made profit projections, she cannot produce the actual projections or testify about the methodology used to achieve them.

### D. Washington's Proffered Testimony

The plaintiffs argue that Washington, as an owner of Sunday Players and an experienced accountant, can testify about the company's lost profits or lost value, using profit projections from Kellwood, Sunday Players, and MTV as a basis for his estimates. They contend that his lay opinion testimony would be admissible under Federal Rule of Evidence 701 and sufficient for the jury to award a lost value verdict. The Court has previously ruled that Washington's testimony would *not* be admissible under Rule 701. See ECF No. 249 at 11-12. The Court sees no reason to reconsider this conclusion.

Rule 701 authorizes lay opinion testimony only when it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. The rule authorizes "the owner or officer of a business to testify to the value or projected profits of the business without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701 Advisory Comm. Notes, 2000 Amendments. This testimony is not admitted because the owner is an expert at valuing his or her own company. It is admitted "because of the particularized knowledge that the witness has by virtue of his or her position in the business." Id. "When a witness has not identified the objective

9

bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992).

In short, Rule 701 assumes that a business owner will make a business valuation based on his or her own personal experience of running the company. That experience includes a past history of sales, trends of historic growth, and knowledge of the company's capital structure and its assets. When an owner's valuation rests on speculative projections of unrealistic future profits, it should be excluded because it is not rationally based on the witness's perceptions. See Von Der Ruhr v. Immtech Int'l Inc., 570 F.3d 858, 862-63 (7th Cir. 2009).

The Court has already likened this case to Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.. There, the district court rejected a business owner's "wildly speculative sales projections" that were "supported neither by data of actual sales nor independent market research." 07-cv-7483 (RJH), 2010 WL 4892646, at *10-11 (S.D.N.Y. Dec. 2, 2010). The plaintiff business owner introduced his own projections that he would be able to sell bottles of water for $15 a bottle by walking door to door and convincing people that the water had medicinal powers. The district court concluded that there was no basis—other than the owner's fanciful predictions—that he could sell water for $15 a bottle.

The plaintiffs argue that Ho Myung Moolsan is distinguishable because, unlike that business owner, Washington has training in making business valuations, firsthand knowledge of the business's operations, and actual research into the compression apparel industry. The Court is not persuaded. Washington may well be a highly qualified accountant, and the Court does not

doubt that he has valued other businesses. But his expertise is not what makes his testimony admissible under Rule 701. It is his firsthand knowledge of Sunday Players's sales and assets. His proffered testimony is not "rationally based" on that knowledge, and it should be excluded. Fed. R. Evid. 701.

Washington asserts that he projected that Sunday Players "could achieve approximately a 20% share of the compression wear market" given the marketing assistance of Kellwood. ECF No. 257 at 5 (Washington Aff.). Using this market share figure, he asserts that "the bottom line projection of lost income for Sunday Players in 2004 was approximately $3,264,400," and "$3,943,800" for 2005. ECF No. 257 at 5 (Washington Aff.). But the Court has already concluded that Sunday Players did not prove that Kellwood's breaches caused lost profits. Washington does not base those numbers on his own experience of selling compression apparel—Sunday Players had approximately $43,000 in revenue during 2003. Other than referring generically to his own research, he does not explain how the company was going to increase its revenue by a factor of 75 in the space of a year. There is simply no non-speculative evidence that Sunday Players could have captured one fifth of the compression apparel market in one year. Trial evidence showed that Nike, an established brand, spent $30 million in advertising to get from three and a half percent of the market to five or six percent. See ECF No. 212 at 23-24 (JMOL Order). Washington's belief that Sunday Players could somehow become a multimillion dollar company overnight is just as "wildly speculative" as the salesman's belief that he could sell water for $15 a bottle. Ho Myung Moolsan, 2010 WL 4892646, at *11.

Citing Lee v. Joseph E. Seagram & Sons, Inc., Sunday Players argues that a business owner can testify about business value even for a venture that "never got off the ground." 413 F. Supp. 693, 705 (S.D.N.Y. 1976). But the plaintiffs in Lee proved their damages through the

11

testimony of a valuation expert, not the business owners themselves. Id. at 706 ("Plaintiffs' proof of lost profits was admitted via the testimony of Ernest L. Sommer, a Certified Public Accountant, who was duly qualified at trial as an expert with experience in evaluating business investments in general and liquor distributorships in particular.") Some of the topics Washington professed to study—consumer behavior, how similar products are marketed, and brand development—might be relied on by an expert to value Sunday Players. But Washington has not been qualified as an expert under Rule 702. Instead he can rely only on his personal knowledge under Rule 701. That personal knowledge is not enough to prove that Sunday Players lost millions of dollars in value.

Sunday Players's request to allow Washington to testify under Rule 701 is, in essence, a request to introduce the revenue projections of Kellwood, Sunday Players, and MTV through his testimony. See ECF No. 257 at 5-6 (Washington Aff.). But for the reasons discussed above, these projections are each independently inadmissible on retrial. Those exhibits must be excluded, and so must his testimony.

### E.     Curley Kelly's and Izell Reese's Proffered Testimony

The plaintiffs proffer the testimony of co-owners Curley Kelly and Izell Reese to prove the company's value. The Court has previously decided that their testimony would *not* be admissible under Rule 701. Nothing in the plaintiffs' offer of proof suggests that the Court was wrong.

Kelly's affidavit is replete with conclusory allegations that Sunday Players's owners "had a thorough understanding of the market and knew what types of marketing, sales, and media strategies would be successful." ECF No. 260 at 4. It does not disclose any facts that would reassure the Court that he had experience valuing a start-up brand with negligible sales. It does

not disclose how his experience selling small quantities of Sunday Players merchandise would justify a multimillion dollar valuation. He is therefore unqualified to testify under Rule 701. His conclusory assertions that the company researched the market are little better than the "research" that led the plaintiff in Ho Myung Moolsan to price his water at $15 a bottle. 2010 WL 4892646, at *8.

Reese's affidavit dwells on his experience as a professional football player and his connections to potential athlete endorsers. He does not attempt to value his connections nor does he indicate a basis for making such a valuation. He asserts that athletes told him that they were ready to sign endorsement deals, but this assertion is, of course, hearsay. Like Kelly, he alleges in a conclusory fashion that he performed "analyses of the market demand, market growth, projected sales and income Sunday Players could generate." ECF No. 261 at 4. But he does not give the Court any reason to believe that he had sufficient experience valuing a start-up brand with negligible sales to make his lay opinion admissible under Rule 701.

### F.     Angela Jackson's Proffered Testimony

The plaintiffs proffer Jackson's testimony to introduce MTV's market share projections and to give details about MTV's viewership. As discussed above, MTV's market share projections are not admissible. The details Jackson proposes to give about MTV's viewership are not relevant to a lost value calculation. Sunday Players never entered into a promotional agreement with MTV, and the details of the unconsummated deal would not help a buyer value Sunday Players. And the testimony cannot be used to prove lost profits because the Court has already detailed the extensive holes in Sunday Players's lost profits case. See ECF No. 212 at 16-27 (JMOL Order). Jackson's testimony would not be sufficient to plug those holes because she is not an expert on marketing and cannot explain the relationship between marketing dollars spent

and revenues achieved—a calculation beyond the ken of the average juror. But even assuming that her additional testimony could plug the holes in Sunday Players's case, the Court would exclude it anyway. The retrial is not an opportunity to retry the case with the benefit of the Court's guidance.

### G. Christopher Plumlee's Proffered Testimony

The plaintiffs proffer Christopher Plumlee's testimony as lay opinion regarding the effectiveness of Sunday Players's preferred marketing plan. This testimony is not relevant to determining the brand's value. For the reasons stated above, Plumlee is not competent to offer lay opinion testimony under Rule 701 based on Sunday Players's own speculative profit projections. Nor will his testimony regarding Sunday Players's proposed marketing strategy be admissible in the second trial for the same reasons that Jackson's testimony would be excluded. The retrial is not an opportunity for the plaintiffs to plug the gaps in their flawed case for causation.

## III. Motion to Designate New Trial Experts

The plaintiffs move to reopen discovery so that they can designate a new expert on lost value damages. When a new trial has been ordered, a court in its discretion can allow new expert testimony if it would avoid "manifest injustice." Martin's Herend Imports, Inc. v. Diamond & Gem Trading United Sates of Am. Co., 195 F.3d 765, 775-76 (5th Cir. 1999) (internal quotation marks omitted).

The plaintiffs made a deliberate tactical decision to rely on one expert in the first trial. He engaged the jury in a flight of fancy that resulted in a multimillion dollar lost profits verdict for a company that sold less than $200,000 of merchandise in its entire history. The Court does not perceive manifest injustice in preventing the plaintiffs from propounding a new, speculative

theory of damages, and the request is denied. Moreover, the case is now 11 years old. It would be unfair to the defendant to prolong this litigation further.

## IV. Nominal Damages

In its Rule 50 Order, the Court concluded that it would "be within its discretion to enter judgment as a matter of law awarding the plaintiffs nominal damages." ECF No. 212 at 29-30 (JMOL Order). Instead, it exercised its discretion to order a new damages trial in the interests of justice. Having seen the evidence Sunday Players would present at retrial—and having considered its theory that it should receive several million more dollars than the verdict the Court has already found to be too speculative—the Court reconsiders its prior order. Sunday Players has not shown that they can prove through admissible evidence a quantifiable lost business value, and the Court will enter judgment in their favor for one dollar.

## CONCLUSION

The Court does not take lightly this decision to deny the plaintiffs a second opportunity to prove their damages to a jury. And had the plaintiffs' second pretrial submissions not revealed that they intended to pursue damages wildly beyond any reasonable foundation, the Court may well have proceeded apace. But the damages estimates in the second proposed Joint Pretrial Order, the arguments the plaintiffs made in opposition to the defendant's *in limine* motion, and the evidence they offered in their proposed exhibit list left the Court certain that the trial would end by directed verdict. The Court, therefore, elected to conserve its resources and the time and service of our jurors by accelerating the inevitable.

The reconsideration motion and motion to designate new trial experts are DENIED. The Clerk of Court is instructed to terminate the motions docketed at ECF Nos. 254, 255, and 274, enter judgment in favor of the plaintiffs for one dollar, and close this case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED: New York, New York
September 30, 2016